IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| KELLI FLOREK,<br><br>                    Plaintiff,<br><br>        vs.<br><br>CREIGHTON UNIVERSITY, KATIE<br>WADAS-THALKEN, RHONDA JONES, and<br>MARYANN SKRABAL,<br><br>                    Defendants. | **8:22CV194**<br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on Defendants' Motion for Summary Judgment (Filing No. 54). Plaintiff, Kelli Florek ("Florek") sued Defendant Creighton University ("Creighton") after she was dismissed from Creighton's Doctor of Pharmacy program (pharmacy program).[1] While attending the pharmacy program, Florek suffered a traumatic brain injury that affected her ability to function in an academic setting. Drawing on events that occurred across Florek's three years in the pharmacy program, Florek contends Creighton violated Americans with Disabilities Act ("ADA"), the Rehabilitation Act, and state law. Specifically, Florek's federal claims allege: (1) Creighton failed to accommodate Florek's disability, (2) Creighton took adverse action (including dismissal from the pharmacy program) because of Florek's disability, and (3) Creighton retaliated against Florek for advocacy related to her disability. Florek's claims under Nebraska state law allege: (1) Creighton's handling of Florek's dismissal breached provisions of Creighton's

---

[1] Florek also sued Katie Wadas-Thalken (Creighton's Assistant Dean for Academic and Student Affairs), Rhonda Jones (Associate Director of Creighton's School of Pharmacy and Health Profession's Office of Experiential Education), and Maryann Skrabal (Director of Creighton's School of Pharmacy and Health Profession's Office of Experiential Education) for tortious interference with contract. They will be referred to collectively as the individual defendants for clarity, though the parties' summary judgment arguments do not distinguish between Creighton and the individual defendants.

student handbook, (2) Creighton's decision to dismiss Florek amounted to tortious interference with Florek's partnership agreement with her pharmacist mentor, and (3) Creighton was unjustly enriched by dismissing Florek and retaining Florek's tuition and fees.

Creighton moved for summary judgment, which Florek opposed. Filing No. 54; Filing No. 56. Florek presents a complex web of overlapping claims based on years of hotly contested interactions. Untangling the web, the Court concludes Creighton is entitled to summary judgment on some of Florek's claims but not others. Specifically, Creighton is entitled to partial summary judgment on Florek's failure to accommodate claim, summary judgment on Florek's disparate treatment claim, and summary judgment on Florek's state law breach of contract claim. On the other hand, portions of Florek's failure to accommodate claim, ADA retaliation claim, state law tortious interference claim, and state law unjust enrichment claim turn on disputed questions of material fact and must be resolved at trial. Therefore, Creighton's motion for summary judgment is granted in part and denied in part as set forth in the following table:

| Claim | Disposition |
|---|---|
| ADA Failure to Accommodate (labeling pre-Fall 2020 accommodations as "academic supports") | Summary Judgment to Creighton |
| ADA Failure to Accommodate (requiring documentation of Florek's disability) | Summary Judgment to Creighton |
| ADA Failure to Accommodate (withdrawal of academic supports after Spring 2020) | No Summary Judgment to Creighton |
| ADA Failure to Accommodate (time and a half on quizzes) | No Summary Judgment to Creighton |
| ADA Failure to Accommodate (time and a half on oral presentations) | Summary Judgment to Creighton |
| ADA Failure to Accommodate (closed captioning on lectures) | Summary Judgment to Creighton |
| ADA Failure to Accommodate (failure to change the date of Florek's Spring 2021 exam) | No Summary Judgment to Creighton |

| ADA Failure to Accommodate (communication medium and style during academic proceedings) | Summary Judgment to Creighton |
|---|---|
| ADA Disparate Treatment | Summary Judgment to Creighton |
| ADA Retaliation | No Summary Judgment to Creighton |
| State Law Breach of Contract | Summary Judgment to Creighton |
| State Law Tortious Interference with Contract | No Summary Judgment to Creighton |
| State Law Unjust Enrichment | No Summary Judgment to Creighton |

## FACTUAL BACKGROUND

This case arises out of the breakdown of a relationship between a student and her university. Creighton is a private university located in Omaha, Nebraska that offers a variety of undergraduate and graduate programs, including Doctor of Pharmacy degree. *See* Filing No. 64-27 at 3–4. Florek, a resident of Hawaii, enrolled in Creighton's Pharmacy Program in August 2018 as a distance student. Creighton dismissed Florek from the program in September 2021. Florek's dismissal occurred after three years of conflict between Florek and Creighton along two general themes: (1) Florek's belief that Creighton was not accommodating her disability, and (2) Creighton's belief that Florek's actions fell below the professionalism standards required of pharmacists. This lawsuit follows.

### A. Pharmacy Education in General

Pharmacy education consists of two general phases: a didactic phase, where the student receives classroom instruction regarding the science and practice of pharmacy, followed by an experiential phase, where the student receives hands on experience in a clinical setting. As a distance student, Florek attended her didactic courses remotely from Hawaii. Filing No. 55-2 at 4, 13:21–14:1. Florek then completed portions of her experiential education in Omaha and the rest in hospitals and pharmacies located in Hawaii. *Id.*

At Creighton, the experiential component of pharmacy training is organized by the Office of Experiential Education. During the relevant period, Jones was the Associate Director of Experiential Education. Filing No. 55-2 at 12:7–23. Skrabal was the Director of the Office of Experiential Education. Filing No. 55-5 at 4, 10:10–17. The experiential phase contains two components: an Introductory Pharmacy Practice Experience (IPPE), which teaches basic clinical skills, and an Advanced Pharmacy Practice Experience (APPE), which mirrors professional practice in a variety of settings. Filing No. 55-5 at 17:17–22.

### B. Applicable University Policies

Florek's relationship with Creighton was structured by several policies promulgated by the University and the School of Pharmacy. *See* Filing Nos. 56-2, 56-3, 56-4, 56-5 (Student handbooks discussing university-wide policies).[2] The Court summarizes the key policy provisions that affected Florek's time at the University.

#### 1. The University's Academic Misconduct Policy

Creighton's handbook delegates the authority to determine the procedures for academic violations to the respective colleges. Filing No. 56-3 at 102. The Academic Misconduct policy provides for a right to an appeal to the provost in matters that result in discipline, including dismissal. *Id.*

#### 2. The School of Pharmacy Scholastic Standing Policy

The School of Pharmacy requires its students to meet basic academic requirements. The School of Pharmacy promulgated the Pharmacy Scholastic Standing Policy that provides for academic probation and, potentially, dismissal if a student fails to

---

[2] The parties have not pointed to any meaningful differences between the policies contained in the various student handbooks. Therefore, the Court will be citing to the 2018-2019 Handbook (Filing No. 56-2).

meet those academic requirements. Filing No. 56-6 at 2–3. Specifically, the policy provides that a student will earn an academic probationary event if the student: (1) fails a course, (2) earns a semester GPA below 2.00, and (3) "for repeated or serious incident(s) of unprofessional behavior." *Id.* at 1. Unprofessional behavior is defined in the School of Pharmacy's Professionalism Policy, discussed in the next section. *Id.* A student is academically dismissed from the School of Pharmacy if the student: (1) receives two failing grades during their time in the program, or (2) "the student is officially notified of a third academic probationary event." *Id.* at 3. After notification of dismissal, the student is permitted to appeal any adverse grade and pursue a written appeal before the Pharmacy Reinstatement Appeals Committee. *Id.* If the student's appeal is denied, the student can appeal to the Dean of the School of Pharmacy and the university provost. *Id.* at 6.

### 3. The School of Pharmacy's Professionalism Policy

The School of Pharmacy promulgated a professionalism policy intended to help students "develop the dispositions of competent and compassionate health care professionals." Filing No. 56-7 at 1. The Professional Behavior Policy applies to "behavior . . . that falls short of academic or non-academic misconduct" that "is . . . in conflict with that articulated in School and profession-based documents outlining expected behaviors (e.g., professional code of Ethics, SPAHP Honor Code, SPAHP Examples of Professional Behaviors document)." *Id.* When a member of the faculty observes unprofessional behavior, they are required to express their concern to the student and "state whether a meeting (face-to-face, telephone, or virtual" is required for further discussion." *Id.* Based on the conversation the policy permits the faculty member to take one of the following actions, in order of severity: (1) take no further action, (2) write

a memorandum of concern in the student's file, (3) issue a professionalism citation, or (4) pursue a charge of academic or non-academic misconduct.  *Id.*  A student is permitted to respond to a professionalism citation in a meeting with the issuing faculty member and in writing at the time the citation is issued.  *Id.* at 3.  The policy provides "[a]ny lack of responsiveness on the student's part to meet with the faculty member as required by the policy will be noted in the citation report and may lead to additional sanctions (e.g., another citation or disciplinary action for academic misconduct)."  Upon receipt of a third professionalism citation, the student is referred to the faculty, who, on a 67% majority, may issue a probationary event.  *Id.* at 4.  The student is permitted to address the faculty in this proceeding.  *Id.* at 3.  All subsequent professionalism citations are referred to the faculty.  *Id.* at 4.

### 4.  The School of Pharmacy's Grade Appeal Policy

Creighton promulgated a multistep process for reviewing grade appeals from pharmacy students.  Filing No. 64-18.  At step 1, the student meets with the instructor to discuss the issues.  *Id.* at 1.  At step 2, both the student and the instructor meet with the department chair to reach a resolution.  *Id.* at 1–2.  After exhausting the informal route, the student is permitted to file a formal appeal in writing with the Assistant Dean for Academic Affairs.  *Id.* at 2.  The appeal is then decided by the University's Academic Issues Hearing Board.  *Id.* at 3.  The policy gives students two weeks after the start of the next semester to complete the informal process and file an official appeal seeking review of a grade.  *Id.* at 4.

6

### 5. The University's Behavioral Misconduct Policy

Outside of the academic arena, Creighton's disciplinary procedures provide for written notice of the alleged violation, an investigative report, a hearing, and an opportunity to appeal prior to imposing certain discipline. Filing No. 64-24 at 114–16. The disciplinary procedure applies "when there is evidence that a student is in violation of a University Community Standard." *Id.* at 114.

### C. Florek Executes a Junior Partnership Agreement to Join a Pharmacy After Graduation

Prior to joining the pharmacy program, Florek was close with Greg Harmon, a pharmacist who runs a small pharmacy on the Big Island of Hawaii. Filing No. 55-1 at 4, 15:20–16:8. Florek lived on a property owned by Harmon and worked with Harmon prior to attending pharmacy school. *Id.* at 4, 14:5–16:8. In August 2019 Florek and Harmon executed a partnership agreement, wherein, upon graduation, Florek would join Harmon's pharmacy as a junior partner, gain equity in the pharmacy over time, and take over the business upon Harmon's retirement. Filing No. 56-48.

### D. Florek's Disability and Requests for Accommodation.

### 1. The Fall 2019 Semester

Starting in 2019, Florek suffered symptoms associated with a traumatic brain injury ("TBI") and received accommodations from Creighton. In 2019, Florek was the victim of a physical assault. Filing No. 55-1 at 11, 59:17–20. After the assault, Florek was treated for a TBI. Filing No. 55-11.

Florek first requested accommodations related to her disability on August 14, 2019. She indicated that she "suffered a closed head injury that resulted in an ongoing severe concussion that has limited my daily activities" and that her doctor predicted her recovery

7

would take around a year. Filing No. 55-10. She described her symptoms in more detail in a "support for a short-term medical condition" request form writing she suffered from:

> Constant headache accompanied by vision sensitivity to light & sluggish eye coordination . . . [,] confusion & memory problems that cause delays in daily activities[,] . . . lack of coordination, foggy, dizzy[,] . . . hard of hearing in right ear only[,] . . . words that sound alike get confused . . . [,] overall slowed reactions & excessive fatigue . . . [and] too long at computer results in severe eye fatigue.

Id. To accommodate these symptoms, Florek requested "eyeglasses with blue filter[,] additional time to complete tasks, assignments, tests, etc.[,] [and] extensive time at computer exacerbates concussion symptoms." Id. Florek's initial submission was accompanied by a letter from her provider indicating "Kelli L Florek is under my medical care, she recently suffered a concussion in June. I am requested that patient be given extended time to finish test and assignments." Filing No. 55-11.

Florek was granted academic supports[3] for the Fall 2019 semester. Filing No. 55-12. Denise LeClair, Director of Disability Services, sent a letter summarizing her academic supports to faculty on August 24, 2019. Id. That term Florek received: (1) "time and one half for exams in a distraction free as possible separate location," (2) the ability to "wear computer, blue light filtering glasses during exams," and (3) "[e]xtended due dates when symptoms exacerbate, with instructor permission." Id. LeClair indicated that the supports may be updated if Florek's "doctor recommends other restrictions." Id. LeClair sent a follow up email indicating that time and a half also related to quizzes after Florek indicated she did not receive time and a half on a quiz in one of her classes. Filing No. 55-13. LeClair updated the extended due date accommodation on November 15,

---

[3] Temporary academic supports are Creighton's terminology for accommodations issued to students who are suffering from short term medical conditions, that are expected to resolve in under six months. See Filing No. 55-17.

2019, to read "if Kelli experiences an exacerbation of symptoms, she may request up to a 48-hour delay for a scheduled exam." Filing No. 55-19; Filing No. 55-20.

Florek utilized her extended due date accommodation on two occasions in the fall 2019 semester.[4] On November 5, 2019, Florek requested to move an exam because "the symptoms of [her] disability [were] exacerbated." Filing No. 55-15. Her professor granted the request. Filing No. 55-16. On December 10, Florek asked to extend a different exam 72 hours because "the symptoms of [her] disability [were] exacerbated." Filing No. 55-21. Citing the language of her accommodation letter, her professor granted a 48-hour extension. Id.

### 2. The Spring 2020 Semester

Florek and LeClair discussed Florek's supports for Spring 2020. LeClair noted Creighton needed medical documentation regarding Florek's "diagnosis, a description of the severity and nature of your impairments because of the concussion, and most importantly, expected duration of the impairments overall and of its effects" to grant more permanent accommodations that would not need to be renewed each semester. Filing No. 55-17.

On January 9, 2020, Florek requested "the same accommodation for continuation as last semester" and attached a note from her doctor. Filing No. 55-22. The note from her physician stated: "Ms. Florek sustained a concussion. Please allow her extended time to complete schoolwork, tasks, tests and quizzes. She also has a history of

---

[4] Florek also received an extension to take an exam because of a power outage during an exam. Filing No. 55-14. She submitted the documentation through the STARS system. Id. Florek also requested non-disability related accommodations relating to internet connectivity. See Filing No. 56-17. When faculty raised issues regarding Florek's internet connectivity, Florek accused the faculty member of "harassing, threatening, and libelous communication," and requested the faculty member "cease and desist all forms of negative communication." Filing No. 56-19.

migraines that are exacerbated by light. Please allow her to use blue light filtering glasses." *Id.* On January 10, 2020, Florek completed Creighton's Office of Disability Accommodations Release of Information Regarding Disability and Request for Accommodations form. Filing No. 63-14. This online form was used to request both short term academic supports and longer-term disability accommodations. Filing No. 63-1, 48:2–9, 49:27. In the form, Florek described her symptoms as "migraine, hard of hearing, light sensitivity, blurry vision, dizziness, eye fatigue, vision impairment" and strategies that worked in the past as "rest and dark dim lighted room . . . [and] the use of blue light filtering glasses & extended time." Filing No. 63-14 at 4. Florek requested similar accommodations to the Fall 2019 but added a request for closed captioning on lecture videos, and a "quiet/distraction free environment when taking tests or completing tasks, assignments, quizzes in zoom or online sessions." *Id.* at 5. Florek indicated in the email regarding the form that she "didn't upload any documents given that I have already emailed you my doctors note." *Id.* at 1. In affidavit testimony, Florek asserts she spoke on the phone with LeClair who "told [Florek] she was approving [Florek] for permanent accommodations and explained that permanent accommodations would mean that I would not need to keep requesting them." Filing No. 63-27 ¶¶ 28–30, 35.

Florek was granted academic supports for the spring 2020 semester. Filing No. 55-24. The substance of Florek's academic accommodations was the same as her accommodations from fall 2019. *Compare id. with* Filing No. 55-20. At Florek's request, Le Clair sent a follow up email indicating her extra time accommodation applied to quizzes as well as tests. Filing No. 55-24.

10

There were two incidents relating to Florek's accommodations during the Spring 2020 semester.  On January 26, 2020, Florek complained that she was not given extra time on an in-class oral presentation.  Filing No. 55-25.  Florek noted that she stumbled over her words during the presentation and did not have time to answer the questions posed by the faculty.  Id. The faculty declined to give Florek extended time on oral presentation, relying on a policy that students did not receive extra time on case presentations because they were intended to mirror real life pharmacy practice.  Id.

On February 6, 2020, Florek informed disability services she had not received extra time for three quizzes in one of her courses.  Filing No. 55-26.  Her professor responded "this was my mistake.  When I received notice of accommodations last week, I added you to one of my lists, but not the second" and reopened the quiz to allow Florek extra time.  Id.

Florek utilized her ability to extend the period to take an exam during on several occasions, notably April 9, 2020.[5]  See Filing No. 63-40 at 4 ("One of my symptom's is exacerbated and has not subsided yet . . . [p]lease allow for the accommodation of my PHA 447 Exam 3 to have an extended due date . . . ."). The request was granted.  Id. at 2.  Florek was instructed to use STARS, a software used to track student absences, to request these accommodations in the future.  Filing No. 63-7 at 1.

In the email chain associated with the April 9 request, Kelly Nystrom (the interim Dean of Academic Affairs), raised issues with Florek's accommodations.  Id.  Specifically, she asked Jacque Knedler (the Associate Director of Disability Services) whether "we

---

[5] Some evidence in the record suggests that Florek used this accommodation on other occasions.  See Filing No. 63-40 at 1 ("Out of the 9 Med Chem exams, this is at least the 3rd or 4th Med Chem exam she [h]as delayed because her symptoms have flared."); Filing No. 64-6 (requesting to change the time of an exam on February 12, 2020).

have adequate documentation on file" because "Kelli can be quite intimidating, and Denise [LeClair] allowed accommodations for the fall without adequate documentation." *Id.* Nystrom went on to say that Florek was "very difficult to work with" and "one of the most demanding students I have ever worked with." *Id.* Knedler responded that she was unsure about Florek's documentation but that LeClair "talked with [her] about how Kelli's symptoms have been continuing, extending her temporary accommodations into more of a permanent disability." *Id.* At her deposition, Knedler did not recall any other instance in which Nystrom asked about the documentation supporting a student's disability. Filing No. 63-1 24:4–12.

### 3. The Fall 2020 Semester

On June 11, 2020, Knedler reached out to Florek to request accommodations going forward and sent a link to the Office of Disability Accommodations Release of Information Regarding Disability and Request for Accommodations form. Filing No. 64-30. Florek, believing the form was duplicative of information she had already provided to Creighton, and believing LeClair's assertion that she did not need to request accommodations in future terms, did not complete the form. Filing No. 63-27 ¶¶ 28–30, 35. There were no issues related to Florek's disability or accommodations during the fall 2020 semester. Florek did request to take her exams later in the day to provide for a distraction free environment, which Wadas-Thalken granted. Filing No. 63-42.

### 4. The Spring 2021 Semester

Florek's issues with accommodations came to a head during the spring 2021 semester. Florek did not complete a request for accommodations form, provide additional

documentation, or communicate with disability services, based on her belief that such a request was unnecessary. Filing No. 63-27 ¶¶ 28–30, 35.

On April 30, Florek submitted a STARS request to change the time of a May 6, 2021, exam from 9:30 AM HST to 12:00 PM HST "due to household members being home, which is a distraction, and I cannot concentrate or focus." Filing No. 55-28. Wadas-Thalken, after discussing the issue with Florek's faculty member denied the request. Id. Florek responded, "I will remind you that I have a disability that has been documented with Creighton for over a year and am allowed a 72-hour extension on exams" and requested her exam be moved to May 7, 2021. Filing No. 55-28. Wadas-Thalken responded that Florek did not have a letter from disability services on file and referred her to Knedler to update accommodations. Id. at 3. Florek refused to discuss the issue with Knedler writing "it is unlawful to ask me to document my disability that is already documented." Id. Knedler, after conferring with Creighton's legal counsel, repeated her request for supporting documentation and offered Florek extended time on exams and the ability to use blue light filtering glasses. Id. at 1–2. She did not allow Florek the ability to change the time of the exam or move it to another day. Id. at 1.

On May 5, 2021, Florek sent a "Disability Discrimination Notice" to Evan Robinson, the dean of the School of Pharmacy and copied Creighton's provost. Filing No. 55-29. In that letter, Florek indicated that "[f]ailure to provide all of my previously established accommodations . . . may result in legal consequences" and indicated that she intended "report this illegal disability discrimination to all Federal agencies." Filing No. 55-29 at 2. Robinson responded that Knedler and Wadas-Thalken had given Florek correct information regarding the process for seeking accommodation and declined to allow her

to change the time of the exam.  *Id.* at 1.  Ultimately, Florek took the exam on May 6, 2021.  *See* Filing No. 64-39 at 3 (Wadas-Thalken writing, on May 12, 2021, ""we stuck to our guns on the issue and miraculously [Florek] got her exam done on time . . ..").

### E.  Florek's Professionalism Citations and Dismissal

Florek had a difficult, and at times combative, relationship with Creighton.  Several of these incidents led to Creighton issuing professionalism citations.  Throughout these incidents Florek accused Creighton faculty of bullying, harassment, and retaliation.

#### 1.  Florek receives her first professionalism citation (January 2019)

Florek received her first professionalism citation prior to her TBI.  Filing No. 56-16. The basis for the first professionalism citation was an incident where Florek and a member of the faculty clashed over the scheduling of a retake exam.  *Id.*  Nystrom indicated he was planning to issue the professionalism citation because Florek failed "to schedule [her] exam when asked to do so" and "manipulated the situation so you could not take the exam Friday morning."  Filing No. 56-13.  In response, Florek accused Nystrom of libel, harassment, making threats and retaliating against her for a complaint about another member of the faculty and appears to have threatened legal action.  Filing No. 56-15 at 2–3.  Nystrom filed the professionalism citation.  Filing No. 56-16.

#### 2.  Florek receives her second and third professionalism citations, fails her IPPE-3, and is placed on academic probation (June 2021)

Florek's second and third professionalism citations arose from the same incident in late May and early June of 2021.  Florek was required to attend an IPPE-4 skills lab in Omaha, followed by an IPPE-3 hospital experience in Hawaii.  Filing No. 56-22.  At the time, Hawaii required a negative PCR COVID test in order to enter the state without quarantining.  *Id.*  Michele Faulkner, Florek's IPPE-4 preceptor allowed Florek to leave

14

class early to attend her appointment. Filing No. 55-1 at 37. Florek missed her appointment, was not tested to for COVID, and was required to quarantine upon her return to Hawaii. Id. at 37–38. Florek did not inform Faulkner or anyone else at Creighton that she missed the appointment for her COVID test. Id. at 38. Instead, she emailed her IPPE-3 preceptor that she "was not given enough time to breakaway to get my COVID test" and asked for her IPPE-3 to be rescheduled to account for her time in quarantine. Filing No. 56-23.

Upon learning of the situation, Jones emailed Florek indicated that they "need to discuss what happened last week regarding you getting your COVID test completed." Filing No. 56-23 at 6–7. Florek acknowledged "Dr. Faulkner allowed me to have time to go get my test however, traffic was bad, and I missed my appointment" and declined to meet over Zoom because it was "unnecessary." Id. at 6. Skrabal also asked Florek to meet, or in the alternative, to answer a series of questions in writing. Id. at 4–5. Florek did not respond and Skrabal issued Florek's second professionalism citation on June 7, 2021. Filing No. 56-24. The professionalism citation was based on Florek's failure to inform Creighton of the missed COVID test and her lack of candor with her IPPE preceptor. Id.

Later that day, Florek sent an email to Skrabal and other members of the faculty reading, in relevant part:

> I've been out sick and until further notice I will be unavailable. I'm still in mandated COVID quarantine by Hawaii State Law and you are causing an unnecessary high amount of stress and anxiety for no justified reason. Also, retaliation and cyberbullying me is not tolerated and it's illegal. Therefore, stop, cease, desist, discontinue, and quit all. I strongly recommend that Creighton University immediately reverses and repairs all sanctions that have been personally taken out on me including: the professional citation, academic probation, and the altering of my grade for PHA 433 IPPE 3 from

incomplete to unsatisfactory failing me, as this is standing on unlawful grounds and there is no legal right to do what was done.

Filing No. 55-32.    Jones responded that the professionalism citation and failing grade were based on Florek's failure to communicate and arrive for her IPPE-3 and would be issued even if Florek was in mandatory quarantine.  Id.  Jones also referred Florek to the grade appeal policy.  Id.  Florek did not sign the second professionalism citation or provide a written response.  Filing No. 56-24.

Florek's third professionalism citation was issued because of her communications on June 7, 2021.  Specifically, on June 9, 2021, Jones expressed "concerns . . . with your lack of professionalism over the past several weeks" and indicated "your email communications to Dr. Skrabal and me in May and early June have been disrespectful, controlling, and demanding.  You also refuse to meet with us virtually to discuss recent communications and circumstances." Filing No. 56-25.  Based on those concerns, Jones issued a third professionalism citation.  See Filing No. 56-26.

Florek was issued a failing grade in her IPPE-3 because she did not show up for the IPPE-3 as scheduled.  Filing No. 55-31.  Florek attempted to appeal the grade directly to the Wadas-Thalken, who instructed Florek to exhaust the informal procedure with Skrabal.  Filing No. 63-46.  Florek did not do so.  Filing No. 56-31 at 2.  As a result, Florek received her first probationary event.  Id.; see also Filing No. 56-6 at 1 (providing for academic probation when a student fails a course).

The next day, Florek emailed Mardell Wilson (Creighton's provost) claiming that Wadas-Thalken, Skrabal, and Jones were "cyberbullying, harassing, threatening, and retaliating against me nonstop." Filing No. 56-27.  She further instructed the members of the faculty to "stop all unacceptable, negative, unlawful, demeaning, harassing,

16

threatening, retaliation, cyberbullying, and belittling behaviors, communications, and actions" and threatened legal action if they did not comply. *Id.* at 2. She ended the email writing "all parties are aware and have knowledge that I have a documented disability. Being harassed, threatened, intimidated, cyberbullied, and retaliated against because I have a disability is a serious legal offense." *Id.* Ultimately, Florek did not meet with Jones or provide a written response to the third professionalism citation. Filing No. 56-26.

On June 16, 2021, Wadas-Thalken informed Florek that because she received her third professionalism citation, she was being referred to the faculty for a possible probationary event and she would have the opportunity to address the faculty. Filing No. 56-29. Prior to the faculty meeting on June 29, 2021, Florek sent another email to Wilson, "to formally appeal and dispute on the record for all of the sanctions that have been issued against me." Filing No. 56-31 at 2. Specifically, Florek referred to the citations as "frivolous," repeated her accusations of harassment, retaliation, and cyberbullying, accused Wadas-Thalken of scheduling the meeting of the faculty during Florek's IPPE-3, and argued she had been deprived of due process. *Id.* at 2–3. Wadas-Thalken responded that the meeting had been scheduled when the faculty were available, Florek had not requested to change the time, and indicated the meeting would go forward. *Id.* at 1. Florek did not appear at the meeting of the faculty and the faculty voted to give Florek a second probationary event. Filing No. 56-30; Filing No. 55-33.

As a part of the probationary event, Florek was required to complete a corrective action plan. Florek completed the plan on July 12, 2021. Filing No. 55-34. When asked to identify her barriers to success Florek indicated Wadas-Thalken, Skrabal, and Jones "have continued to cyberbully me, harass me, retaliate against me, discriminate against

17

me and threaten me" and that Florek believed the members of the faculty "have personally taken their anger and actions out on me because I have a disability." *Id.* at 1. When asked to describe her study strategies Florek indicated "I reserve the right to retain legal counsel." *Id.* at 3.

### 3.  Florek receives her fourth professionalism citation (August 2021)

Florek's fourth and final professionalism citation related to an incident involving her APPE experience.  The record shows a convoluted series of events associated with scheduling Florek's APPEs, but the basic contours are clear: Florek wanted to complete all six of her eight APPEs with Harmon, Creighton only allowed Florek to complete three APPE rotations with Harmon, and Creighton scheduled the other APPEs at other sites. Filing No. 55-1 at 47, 212:11–218:2 (Florek's testimony regarding the conflict between Harmon and Creighton); Filing No. 56-33 (Florek's APPE schedule); Filing No. 55-35 (Harmon's email to Creighton asking for three APPE rotations to be reinstated). On August 25, 2021, Jones learned Harmon contacted Florek's next preceptor to cancel the APPE rotations and informed the preceptor that Florek would be completing the rotation at his pharmacy.  Filing No. 55-36.  Jones contracted Florek to ask for clarity about the situation, setting a meeting for August 31st. *Id.* Florek did not respond. Filing No. 55-1 at 50, 226:21–227:2 (Q: Did you respond to Dr. Jones' August 25, 2021, email?  A: I don't believe I did . . . there was a time where I was getting emails and enough was enough.  I could only handle so much harassment, discrimination.").

In response, on August 30, 2021, Florek contacted Robinson, stating "communications coming from [Jones], [Skrabal], and [Wadas-Thalken] are not welcome" and "continue to be a form of harassment and bullying" that are "exacerbating [her]

disability." Filing No. 56-38 at 4.  She noted if the faculty members continued to email her "I have no other choice to file a restraining order against" them and threatened to file a formal complaint. *Id.* Robinson responded "[i]t is not harassment for faculty or administrators to contact you and/or request meetings" and warned Florek "failure to participate in normal educational processes . . . could result in adverse consequences to you." *Id.* at 3.  Florek responded that Robinson is "not the victim.  I am the victim.  Your threats to come after me with sanctions and 'adverse consequences' when I'm the victim will not silence my voice . . . disabilities matter and my voice matters, and I will not be silenced, harassed, or bullied because of my disability." *Id.* Robinson did not notify Jones, Skrabal, and Wadas-Thalken to cease and desist all communications but forwarded Florek's complaints to the Title IX office. *Id.* at 2.  Jones learned of this email and texted a different member of the faculty that Florek was "accusing us of harassment and bullying and that if any of us email her again, she is getting a restraining order.  She is unbelievable." Filing No. 64-37.

On September 3, 2021, Jones issued Florek's fourth professionalism citation because of Florek's refusal to meet regarding her APPE schedule. Filing No. 56-39. Florek did not sign the form or provide a written statement. Filing No. 56-40.

### 4.  Florek is dismissed from Creighton (September 2021)

Florek's fourth professionalism citation triggered an academic probation vote by the faculty under the Professionalism Policy. Filing No. 56-43.  Florek faced academic dismissal because she had received two probationary events. *Id.*; Filing No. 56-6 at 3. Florek did not appear at the meeting of the faculty or prepare a written submission. Filing No. 55-1 at 240:16–22.   On September 16, the faculty voted to dismiss Florek from

19

Creighton because she "earned [her] fourth unprofessional behavior citation, combined with [her] previously earned probations." Filing No. 56-45. Florek did not appeal her dismissal. Filing No. 56-47 ("Because you chose not to appeal your dismissal, this letter confirms you were dismissed and are now withdrawn from our pharmacy program.").

### F.  This Lawsuit

Florek filed the present lawsuit on June 1, 2022. Filing No. 1. The Court has jurisdiction over Florek's federal law claims under 28 U.S.C. § 1331 (federal question) and Florek's state law claims under 28 U.S.C. § 1332 (diversity jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction).

DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that "an adverse party cannot produce admissible evidence to support" a fact essential to the nonmoving party's claim. Fed. R. Civ. P. 56(c)(1)(A) & (B). The plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

20

"The movant 'bears the initial responsibility of informing the district court of the basis for its motion and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex Corp.*, 477 U.S. at 323). If the movant does so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* (*quoting Celotex Corp.*, 477 U.S. at 324). A "genuine" issue of material fact exists "when there is sufficient evidence favoring the party opposing the motion for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

The evidence must be viewed in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *Kenney v. Swift Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003). "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations." *Id.* "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Koehn v. Indian Hills Cmty. Coll.*, 371 F.3d 394, 396 (8th Cir. 2004). If "reasonable minds could differ as to the import of the evidence," summary judgment should not be granted. *Anderson*, 477 U.S. at 251.

Nebraska substantive law governs Florek's state law claims. *See Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). In analyzing Florek's state law claims the Court is "bound in [its] interpretations of Nebraska law by the decisions of the Nebraska Supreme Court." *Packard v. Darveau*, 759 F.3d 897, 901 (8th Cir. 2014) (quoting *Lindsay Mfg. Co. v. Hartford Acc. & Indem. Co.*, 118 F.3d 1263, 1267 (8th Cir. 1997). If the Nebraska Supreme

Court has not considered an issue, the Court must "predict what the court would decide if it were to address the issue" based on "relevant state precedent, analogous decisions, considered dicta, . . . and any other reliable data." *Id.* (internal quotations omitted).

### B.  ADA- Failure to Accommodate

Florek contends that Creighton violated the ADA by failing to accommodate her disability.   Florek's contentions are wide ranging but break down into three core complaints: (1) Creighton failed to engage in a sufficiently interactive process, (2) Creighton failed to grant formal accommodations, (3) Creighton failed to provide specific accommodations.  The Court first addresses the legal framework for assessing failure to accommodate claims under the ADA and then addresses Florek's specific contentions.

#### 1.  Legal framework

Florek's substantive cause of action arises under two federal statutes, Title III of the ADA and the Rehabilitation Act.  The ADA provides in relevant part, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182.  Title III imposes an affirmative duty on places of accommodation to "make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations" *Id.* at § 12182(2)(A)(ii). Likewise, the Rehabilitation Act requires

colleges and universities to accommodate otherwise qualified students with disabilities. *See* 29 U.S.C. § 794(a). Under circuit precedent, the ADA and Rehabilitation Act are construed interchangeably. *Argenyi v. Creighton Univ.*, 703 F.3d 441, 448 (8th Cir. 2013).

To succeed on her failure to accommodate claim, Florek must show: (1) Florek was disabled and otherwise qualified for the pharmacy program, (2) Creighton was a place of public accommodation that receives federal funding, and (3) Creighton failed to make reasonable modification that would accommodate Florek's disability without fundamentally altering the nature of Creighton's program. *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076 (8th Cir. 2006). Florek "bears the initial burden of demonstrating that [s]he requested reasonable accommodations" and that those accommodations "[were] necessary to enable [her] to participate in light of [her] disabilities." *Id.* at 1077.

Creighton does not contest that Florek was disabled and otherwise qualified or that Creighton is subject to Title III and the Rehabilitation Act. Filing No. 58 at 3 n.2. Creighton rather argues the accommodations asserted by Florek are either unreasonable or were not requested by Florek. *Id.*

The Court proceeds in the following order. First, it addresses Florek's argument that Creighton failed to engage in an interactive process. Second, it discusses Florek's assertion that Creighton provided no accommodations for her disability. Third, it drills down and addresses specific accommodations that Florek believes were not provided.

### 2. Creighton's failure to engage in an interactive process.

First, Florek argues Creighton failed to engage in a sufficiently interactive process to determine what accommodations may be necessary. The implementing regulations of Title I of the ADA require employers who are informed of an employee's disability and

desire for accommodation to work with the employee in "a flexible and interactive process" to determine an appropriate reasonable accommodation. 29 C.F.R. § 1630, App. § 1630.9; *see Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944 (8th Cir. 1999) (summarizing the requirement in the Title I context). In the employment context "there is no per se liability under the ADA if an employer fails to engage in an interactive process," but failure to engage in the process is evidence that the employer did not make a good faith attempt to accommodate the employee's disability. *Id.* at 952.

The Eighth Circuit has never squarely addressed whether the interactive process requirement applies in the Title III or higher education contexts. *See e.g., Koester v. Young Men's Christian Ass'n of Greater St. Louis*, 855 F.3d 908, 913 (8th Cir. 2017) ("assuming with a healthy dose of skepticism that these concepts are applicable in this Title III case" and concluding the YMCA met any interactive process requirement); *Stern v. Univ. of Osteopathic Med. & Health Scis.*, 220 F.3d 906, 909 (8th Cir. 2000) ("Even if such an interactive process is required in an academic setting . . . we conclude that Mr. Stern nonetheless would have to establish that reasonable accommodations for his disability would render him qualified for the medical school program.").[6] District courts within the Eighth Circuit, in dicta, have split on the potential applicability of the interactive

---

[6] Other federal courts are split on this issue. The Ninth Circuit held that Title III does not impose an interactive process requirement because the text of Title III and its implementing regulations do not make any reference to an interactive process and require the public accommodation to "mak[e] the ultimate decision as to what measures to take." *Tauscher v. Phoenix Bd. of Realtors, Inc.*, 931 F.3d 959, 964–65 (9th Cir. 2019); *see also LaBonte v. Riverside Park Enterprises, Inc.*, No. 3:22-CV-30046-KAR, 2022 WL 17253663, at *4 (D. Mass. Nov. 28, 2022) (collecting district court authority to the same effect). However, the Fifth Circuit, albeit in the Title II context applicable to public universities, indicated a degree of interactivity is required between students and their universities because of the similarities between accommodations in the workplace and higher education contexts. *Pickett v. Texas Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1033 (5th Cir. 2022). Likewise, Florek's other out of circuit caselaw recognizing the interactive process in the academic context, arose under Title II and involved a public university. *See* cases cited in Filing No. 66 at 5. The Court does not prejudge that this distinction is significant but would prefer guidance on whether there is a meaningful difference between Title II and Title III and public universities and private universities.

process requirement in the higher education context. *Compare Stebbins v. Univ. of Arkansas*, No. CIV. 10-5125, 2012 WL 6737743, at *8 (W.D. Ark. Dec. 28, 2012) (citing a Title I case, *Ballard v. Rubin*, 284 F.3d 957, 960 (8th Cir. 2002), to indicate a request for accommodation must be sufficient to "invoke the 'interactive process'" but not analyzing whether the university engaged in the interactive process) *with Rossley v. Drake Univ.*, 342 F. Supp. 3d 904, 940 (S.D. Iowa 2018) (distinguishing Title I cases involving the interactive process and expressing skepticism that the principle applies in the academic setting). The question posed by the parties does not have a clear answer and neither party has offered a close reading of Title III and its implementing regulations or a roadmap for making sense of contradictory caselaw on the subject.

Ultimately, the Court declines to reach this question at this stage in the litigation. In the Title I context, failure to engage in the interactive process is not a standalone basis for liability but rather part of analyzing the request for a specific accommodation. *Fjellestad*, 188 F.3d at 952. Here, as detailed below, Florek's failure to accommodate claims survive summary judgment or do not for reasons independent from Creighton's engagement in the interactive process. *See infra* Sections B.3-6. Even if the Court were to hold that the interactive process requirement does not apply in the Title III context, Creighton would not automatically be entitled to judgment as a matter of law because the Court would need to resolve whether a reasonable accommodation was requested or available. Likewise, Florek's claims that fail on summary judgment, would fail even if the Court considered the interactive process. *See Amir v. St. Louis Univ.*, 184 F.3d 1017, 1029 (8th Cir. 1999) (summary judgment appropriate if proposed accommodation is unreasonable based on university's academic judgment); *Rossley v. Drake Univ.*, 979

F.3d 1184, 1197 (8th Cir. 2020) (summary judgment appropriate if record conclusively shows plaintiff did not adequately request an accommodation).[7]

### 3. Creighton's failure to provide any accommodation for Florek's disability

Florek contends Creighton refused to take any steps to accommodate Florek disability. Florek's contention is best addressed by splitting it into two time periods: the first covering the time between her TBI and Fall 2020 in which Florek received "academic supports" related to her concussion symptoms and the time between Fall 2020 and her dismissal, in which Florek did not receive academic supports through the University.

Florek's claim that Creighton never provided disability accommodations is not supported by the record for the period prior to Spring 2021.[8] The record shows that on receipt of Florek's documented disability and request for accommodations, Creighton granted temporary academic supports to address issues related to Florek's TBI. Specifically, in August 2019, Florek received: "time and a half for exams in a distraction free as possible separate location," the ability to wear blue light filtering glasses during exams, and extended due dates when symptoms exacerbate . . .." Filing No. 63-4. Florek received similar accommodations in November 2019, which added the ability to receive a 48-hour extension on scheduled exams when her symptoms flared up. Filing No. 63-29; *see also* Filing No. 63-12 (same in January 2019). These accommodations match up with the documentation provided by Florek's healthcare provider. *See* Filing No. 63-36 (Florek's medical provider requesting "that patient be given extended time to finish test

---

[7] The parties are welcome to reraise this issue in the context of jury instructions once they have narrowed down the specific accommodations at issue and are in a better position to assess whether an instruction regarding interactive process is necessary.
[8] This section addresses whether Creighton's general approach failed to accommodate Florek's disability. Florek's claims regarding specific accommodations are addressed *infra* Section B.4.

and assignments"); Filing No. 63-34 (Florek's medical provider requesting "extended time to complete school work, tasks, tests and quizzes"). Therefore, through the Spring 2019 semester, the uncontroverted record shows that Creighton modified its academic program to account for the limitations imposed by Florek's TBI.

Florek argues the modifications were inadequate as a general matter for two reasons: (1) the modifications were labeled as temporary academic supports rather than disability accommodations, and (2) Florek was required to submit updated documentation to renew her academic supports. Florek does not cite any authority for the proposition that Creighton's label for the modification is legally significant. The substance of academic supports, in other words, whether they were reasonable modifications necessary to accommodate the student's disability, are the focus of the reasonable accommodation inquiry, not the label used by the institution. Moreover, Creighton was permitted to request reasonable documentation of Florek's disability and functional limitations. *C.f., Koester*, 855 F.3d at 913; EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disability Act, EEOC Notice 915.002 (October 17, 2002), available at http://www.eeoc.gov/policy/docs/accommodation.html (reflecting guidance from the EEOC that an "employer may ask the individual for reasonable documentation about his/her disability and functional limitations"). Indeed, Creighton's request for follow up documentation mirrored the applicable EEOC regulations. *Compare id. with* Filing No. 55-17. Given the uncertainties associated with recovery from a TBI in general, and Florek's TBI in particular, Creighton acted consistently with Eighth Circuit caselaw and

EEOC guidance. Therefore, there is no basis in the record for a jury to conclude that Creighton's general approach prior to Fall 2020 failed to accommodate Florek's disability.

By contrast, there is a disputed issue of material fact as to whether Florek's disability was accommodated in the Fall 2020 semester through her dismissal. Creighton argues, while conceding that Florek was disabled during the rest of her time in the pharmacy program, that Florek was not entitled to accommodations because she failed to provide required documentation and comply with Creighton's procedure for requesting disability accommodation. Filing No. 71 at 6. Of course, Creighton is permitted to establish procedures for the orderly processing of accommodation requests and can require reasonable documentation in support of accommodations requests. *Koester*, 855 F.3d at 913. On the facts, Creighton has a strong argument that Florek was not entitled to disability accommodations after the Fall 2020 semester because she did not renew her request or provide documentation demonstrating her TBI symptoms would continue to recur for the foreseeable future. *See* Filing No. 72 at 33 (Creighton's response to Florek's statement of material facts).

However, that is not the only conclusion a fact finder could come to. A reasonable jury could conclude that Florek's medical documentation plus her descriptions of continuing symptoms were sufficient to request a reasonable accommodation. A reasonable jury could also rely on the fact that Florek submitted requests for accommodation for the Spring 2020 semester using the system used to request permanent accommodations. Filing No. 63-1, 48:2–9, 49:27. A reasonable jury could credit Florek's assertion that she was told she did not need to submit additional information as consistent with other evidence in the record. Filing No. 63-27 ¶¶ 28–30,

35; Filing No. 63-40 at 1 (Knedler indicating LeClair "extend[ed] her temporary accommodations into more of a permanent disability"). Moreover, a reasonable jury could conclude that in Spring 2021, Creighton recognized that Florek properly requested and was entitled to accommodations for her continuing disability because they ultimately provided Florek with a portion of the accommodations she requested. *See* Filing No. 55-28 at 1. Therefore, Creighton is not entitled to summary judgment based on Florek's failure to comply with the documentation requirements for disability accommodations after the Spring 2020, though they are welcome to reraise the issue at trial.

### 4. Creighton's failure to provide specific accommodations.

Beyond the broad assertion that accommodations were never provided, Florek claims six specific accommodations were not provided. Specifically, Florek argues she did not receive: (1) time and a half on all quizzes, (2) closed captioning on lectures, (3) time and a half on oral presentation, (4) the ability to change the time of one exam when there were distractions in the home and her symptoms flared up, (5) unspecified accommodations during her IPPEs and APPEs, and (6) written, non-accusatory communications during the professionalism citation and dismissal process. *See* Filing No. 66 at 10–11.

#### a. Time and a half for quizzes.

Florek presents a triable issue of fact of whether Creighton's failed to accommodate her disability when it failed to ensure she received time and half on quizzes. Florek requested and was granted time and a half on quizzes but did not receive them on several occasions. Filing No. 55-26. Creighton does not argue that time and a half was unreasonable. Indeed, the fact that Creighton granted the accommodation several

semesters in a row suggests that it was a reasonable accommodation.  *See Palmer Coll. of Chiropractic v. Davenport C.R. Comm'n*, 850 N.W.2d 326, 343–44 (Iowa 2014) (collecting federal cases).  Nor does Creighton argue that it used its academic judgment to conclude that time and half was inappropriate.  Rather, Creighton concedes extra time was not given because of instructor error.  Finally, Creighton did not brief the "inherently fact intensive issue" of whether this instructor error deprived Florek of equal opportunity to benefit from Creighton's program.  *Argenyi*, 703 F.3d at 449.  Therefore, summary judgment is inappropriate for Florek's claims relating to extra time for quizzes.

### b. Closed captioning on lectures

Florek contends she requested but did not receive closed captioning on lectures after requesting them for the Spring 2020 semester.  Filing No. 66 at 12.  Creighton argues Florek did not properly request the accommodation.  Filing No. 72 at 23. A student seeking a reasonable accommodation must request the accommodation and tie it to symptoms of the student's disability. *Rossley v. Drake Univ.*, 979 F.3d 1184, 1197 (8th Cir. 2020).  Here, while Florek requested closed captioning by listing it on the request for accommodation, she did not provide any evidence from her providers that such an accommodation was necessary in light of her disability.  *Compare* Filing No. 63-14 at 5 (requesting closed captioning) *with* Filing No. 55-22 ("Ms. Florek sustained a concussion.  Please allow her extended time to complete schoolwork, tasks, tests and quizzes.  She also has a history of migraines that are exacerbated by light.  Please allow her to use blue light filtering glasses."). Therefore, Creighton is entitled to summary judgment on Florek's failure to accommodate claim related to closed captioning.

### c. Time and a half for oral presentations

In contrast, Creighton is entitled to summary judgment on Florek's failure to accommodate claim based on the failure to provide time and half on oral presentations because the decision was based on Creighton's academic judgment. When an accommodation decision "involves an academic decision '[courts] should show great respect for the faculty's professional judgment'" and should not "invade a university's providence concerning academic matters in the absence of compelling evidence that the academic policy is a pretext for discrimination." *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1029 (8th Cir. 1999). Here, Florek was not granted extra time on the oral presentation based on Creighton's academic judgment. Specifically, Creighton maintains a generally applicable policy that does not provide extra time for case studies because the "case study section of the course is a simulation of real-life pharmacy practice." Filing No. 63-38. Here, Florek disputes that the time constraints in the exercise accurately mirror real life but does not point to any record evidence that would allow a jury to conclude the case study policy was a pretext for disability discrimination. *See* Filing No. 66 at 12. Moreover, the best design for simulation exercises in a classroom setting is a quintessential academic determination that the federal courts are ill equipped to review. *Gati v. W. Kentucky Univ.*, 762 F. App'x 246, 251 (6th Cir. 2019) (deferring to a university's judgment that an experiential class should not take place online). Mindful of the Court's deferential role in reviewing academic decisions, Creighton is entitled to partial summary judgment on Florek's failure to accommodate claim to the extent it relies on Creighton's failure to provide extra time for case study presentation.

### d. Creighton's failure to allow Florek to change the time of an exam to allow for a distraction free environment.

Summary judgment is inappropriate for Florek's failure to accommodate claim based on the incident involving the May 6, 2021, exam. There, Florek requested her exam be moved two and a half hours to allow her to take the exam in a distraction free environment. Filing No. 55-28. The factual record is messy but there is sufficient evidence for the jury to conclude that changing the time of Florek's exam was a reasonable modification, requested by Florek, related to Florek's disability. Specifically, based on communications with Florek and her medical providers, Creighton was on notice of Florek's need for a distraction free environment and extended deadlines when symptoms exacerbated. *See* Filing No. 63-14 at 5. Florek's earlier accommodation letters explicitly referenced a distraction free environment as a reasonable accommodation for her TBI symptoms. Filing No. 55-12. Previously, Creighton had granted Florek 48-hour extensions as an accommodation under similar circumstances. Filing No. 63-6. Indeed, though unrelated to disability, Creighton previously allowed Florek to change the time of her exams to allow her to take exams once her family left for the day. Filing No. 63-42. Florek requested to change the time of her exam through the STARS system, which she had previously used to request accommodations related to her TBI. Filing No. 63-6. Finally, after her request to change the time of the exam was denied, Florek specifically invoked both her disability and desire for accommodation. Filing No. 55-28 at 2. Based on these facts, a reasonable jury could conclude changing the time of the exam was a reasonable accommodation requested by Florek.

Creighton offers three arguments for why summary judgment is nevertheless appropriate.[9]  None alter the Court's conclusion that summary judgment is precluded by disputes of material fact.

First, Creighton argues that Florek failed to tie her request for a delay to her disability.  Filing No. 58 at 4.  To survive summary judgment, Florek must show that she explicitly requested an accommodation and tied it to her disability.  *Rossley*, 979 F.3d at 1197.  Specifically, Creighton relies on the text of her initial STARS submission, which requested a delay "due to household members being home, which is a distraction, and I cannot concentrate or focus.  I also test better the later I take the exam for this reason." Filing No. 55-28.  However, a reasonable jury could conclude that the request was disability related based on Florek's pattern of requesting disability related accommodations through the STARS system, the use of the "distraction free" language that appeared in her accommodations letters, and the request for a specific accommodation that had been formally granted in the past.  *See* Filing No. 63-6 (requesting Florek use the STARS system for disability-related requests); Filing No. 55-12 (using "distraction free" language to describe Florek's granted accommodation).  In any event, even if the initial communication was not sufficiently specific, Florek's follow up communications specifically tied her request for accommodation to her disability.  Filing No. 55-28 at 2 ("Please make arrangements and provide the accommodation for my disability . . ..").  Because a reasonable jury could determine that Florek tied the request to delay her exam to her disability, summary judgment is inappropriate.

---

[9] Creighton also argues that Florek was not entitled to disability accommodations because she failed to comply with Creighton's internal procedures for requesting disability accommodations. As discussed, *supra* Section B.3, this argument turns on disputed issues of material fact and is not a basis for summary judgment.

Second, Creighton argues Florek's accommodation request was unreasonable as a matter of law because Creighton did not control the environment where Florek took the exam. The reasonableness of a specific accommodation is generally a fact-bound analysis where Florek must show that the accommodation was "reasonable on its face" and Creighton then holds the burden to show a specific reason why accommodation was not possible. *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401–02 (2002). Creighton cites to no provision of the ADA or its implementing regulations, caselaw from the Eighth Circuit, or persuasive caselaw from other jurisdictions establishing such an accommodation is unreasonable as a matter of law. *See* Filing No. 58 at 5–6. Indeed, Florek's argument that changing the time of an exam is analogous to allowing a student to take an exam in a separate room appears reasonable on its face. While Creighton now claims it was unreasonable to accommodate distractions that occurred outside of its control, Creighton previously granted accommodations related to test taking in a distraction free environment. Filing No. 55-12; *Palmer College of Chiropractic*, 850 N.W.2d at 344 (collecting federal cases recognizes an institution's prior recognition of an accommodation as evidence of reasonableness). Creighton's choice to use the "distraction free environment" language in Florek's accommodation letter cuts against their assertion in litigation that such an accommodation is inherently unreasonable for distance students. Filing No. 55-12. Therefore, applying all interferences in the light most favorable to Florek, a reasonable jury could conclude that rescheduling the exam was a reasonable accommodation, even if Creighton did not control Florek's home environment.

Third, Creighton argues that declining rescheduling the exam did not "deny Florek meaningful access or equal opportunity to participate in Creighton's School of Pharmacy

Program." Filing No. 58 at 6. Specifically, Creighton argues that Florek continued towards graduation after the exam and was removed from the program for reasons unrelated to her disability accommodation request. *Id.* Whether an accommodation was necessary is an "inherently fact intensive issue." *Argenyi*, 703 F.3d at 449. *Argenyi* forecloses Creighton's argument that it is entitled to summary judgment because Florek continued as a pharmacy student after the May 2021 exam. There, the Eighth Circuit determined that evidence that a deaf student "was unable to follow lectures and classroom dialogue or successfully communicate with clinical patients" was sufficient to survive summary judgment and go to a jury. *Id.* Florek likewise contends that the failure to accommodate affected her ability to equally participate in Creighton's program. The Court will let the jury weigh the evidence on this topic in the first instance.

### e. Creighton's failure to accommodate Florek's disability during her IPPEs and APPEs.

In Florek's complaint, Florek alleged that Creighton failed to accommodate her disabilities during her experiential education (the IPPEs and APPEs). Filing No. 1 at 14. At this stage it is Florek's burden to articulate a reasonable and necessary accommodation Creighton should have provided. *Mershon*, 442 F.3d at 1077 However, it is unclear exactly what accommodations Florek required and did not receive during those experiences. It is clear from the briefing and record in the case that Florek is unhappy with her IPPE and APPE experiences. Florek expressed COVID-19 related concerns about attending her IPPE in Omaha, missed her COVID test, and received a professionalism citation for missing her IPPE in Hawaii while quarantining. Filing No. 1 at 7. Likewise, Creighton did not allow Florek to complete all six of her APPEs with the pharmacist of her choice. *Id.* at 9–10. While Florek is unhappy with her experience at

Creighton in these instances, she does not propose how those incidents resulted from Creighton's failure to accommodate her disability. Without a concrete accommodation to consider, the Court concludes Florek has not met her burden of identifying a reasonable accommodation. Therefore, summary judgment is appropriate on Florek's claim that Creighton failed to accommodate her disability during her IPPEs and APPEs.

### f. Creighton's communications with Florek associated with her professionalism citations and dismissal.

Creighton is entitled to summary judgment on Florek's claim that Creighton failed to accommodate her disability during the disciplinary process because no reasonable jury could conclude Florek requested those accommodations. Specifically, Florek argues that Creighton should have accommodated her disability during disciplinary proceedings by: (1) communicating with Florek over email rather than insisting on in-person meetings, (2) adopting a less accusatory tone in its communication, and (3) giving Florek additional time to comply with procedural requirements.[10] Filing No. 66 at 9. However, Florek failed to produce evidence that Florek communicated the symptoms giving rise to the need for accommodation or her desire for specific accommodations to Creighton during her academic proceedings.

To show that Creighton had a duty to provide a specific accommodation, Florek must "demonstrate that [s]he requested reasonable accommodations." *Mershon*, 442

---

[10] At times, Creighton appears to suggest Florek is seeking an accommodation for her unprofessional behavior. Filing No. 71 at 9. Certainly, Creighton is permitted to apply its generally applicable professionalism expectations to students with disabilities and an accommodation for unprofessional behavior may be unreasonable. *See Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 462–65 (4th Cir. 2012) (holding a medical school was not required to make an exception to its generally applicable professionalism requirement under the ADA). However, Florek's argument is slightly different. Florek does not challenge that the substance of her academic dismissal but rather argues that the approach taken by Creighton deprived her of her ability to equally participate in the professionalism citation and academic dismissal process. Filing No. 66 at 21. Specifically, she argues, had Creighton accommodated her disability during the proceedings she would have had an equal opportunity to present her case. *Id.*

F.3d at 1077. Caselaw is instructive. In *Rossley v. Drake Univ.*, the university expelled the plaintiff after determining the plaintiff sexually assaulted another student. 979 F.3d at 1185. The plaintiff had ADHD, dyslexia, and word-retrieval issues and received academic accommodations from the university including time and a half. *Id.* at 1197. After his expulsion, plaintiff sued under Title III of the ADA arguing the university failed to accommodate his disability when it did not allow him extra time in disciplinary proceedings. *Id.* The Eighth Circuit affirmed a grant of summary judgment to the university because there was no evidence showing the plaintiff "made no specific request, formal or informal, for an accommodation." *Id.* The Eighth Circuit held that it was not enough that the university was generally on notice of plaintiff's disability or his accommodations in the academic setting. *Id.* Nor was it enough that plaintiff requested extra time during disciplinary proceedings when it was "consistently raised as an issue of procedural fairness" and "did not connect his demands to his disability." *Id.*

*Rossley* controls the outcome on this issue because there is no evidence that would allow a jury to conclude Florek requested accommodations for her TBI related to her professionalism citations or dismissal. Though Florek received similar accommodations in the classroom setting, the Eighth Circuit is clear that a formal or informal request must be made for each new context and the ADA does not require a university to accommodate a student's non-disability concerns. *Rossley*, 979 F.3d at 1197. Florek never formally or informally requested extended time, to be excused from Zoom meetings, or less accusatory communications as an accommodation for her TBI. When she discussed these issues, she framed them in non-disability terms including procedural due process, her schedule, and her belief that the faculty's communications

were discriminatory or retaliatory.  *See e.g.* Filing No. 56-31 (objecting to a zoom meeting on due process grounds); Filing No. 55-34 (objecting to faculty communications as adverse actions motivated by Florek's disability).  Therefore, Creighton is entitled to summary judgment under *Rossley*.

In sum, Florek has raised a genuine issue of material fact related to the following specific accommodations: (1) time and a half on quizzes, and (2) changing the time of Florek's May 2021 exam.  Florek's second contention is not precluded as a matter of law by her failure to request the accommodation through Creighton's official channels because there are fact disputes related to whether Florek satisfied the requirements of Creighton's policy.  Otherwise, Creighton is entitled to summary judgment on Florek's ADA failure to accommodate claim.

### C. ADA- Disparate Treatment

Creighton is entitled to summary judgment on Florek's disparate treatment claim because Florek failed produce evidence showing that Creighton's stated reasons for her professionalism citations and dismissal from program were pretext for disability discrimination.  In other words, she did not submit evidence showing Creighton's stated reasons were wrong and that disability discrimination was the real reason for her professionalism citations and dismissal.

#### 1. Legal framework

To succeed on a disparate impact claim, Florek must show that she was treated worse because of her disability.  More specifically, she must show that she (1) was disabled and qualified to attend Creighton's pharmacy program, (2) Creighton is a public accommodation and recipient of federal funding, and (3) Creighton discriminated against

Florek because of her disability. *Argenyi*, 703 F.3d at 447. Creighton does not dispute that Florek was disabled and qualified to attend the pharmacy program or that Creighton is subject to the ADA and Rehabilitation Act. Filing No. 58 at 3 n.2.

Florek does not point to any direct evidence of discrimination. Therefore, the familiar *McDonnell Douglas* burden shifting framework applies. *Kosmicki v. Burlington N. & Santa Fe R. Co.*, 545 F.3d 649, 651 (8th Cir. 2008). At step one, the prima facie case, Florek must show that (1) she was disabled, (2) she was qualified to attend Creighton's pharmacy program, (2) Creighton took adverse action against her because of her disability. *Id.* At step two, Creighton must proffer a legitimate, nondiscriminatory reason for the adverse action. *Id.* At step three, Florek must show evidence that Creighton's stated reason was pretext for discrimination based on her disability. *Id.* To prove pretext, Florek must produce evidence that Creighton's "stated reasons did not motivate [it's] decision" to take adverse action and her TBI was the real reason. *Id.* at 651–52.

### 2. Prima facie case

Creighton argues that Florek failed to make her prima facie case because she failed to show "material adverse consequences" associated with her professionalism citations and that there was insufficient evidence that Florek's disability motivated Creighton's dismissal. Filing No. 58 at 8–12. The Court concludes Creighton's first argument fails because, even if the Eighth Circuit applied a materiality requirement for adverse action under the ADA, the requirement did not survive the Supreme Court's recent decision in *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346 (2024). The Court concludes, except for one professionalism citation that preceded Florek's TBI, Creighton's second set of arguments are better addressed at the pretext stage because only a

"minimal showing" is required at step one of *McDonnell Douglas* analysis. *Kosmicki*, 545 F.3d at 651.

### a. Adverse Action

The parties disagree on what actions taken by Creighton constitute an adverse action for the purpose of the *prima facie* case. Creighton argues that because only "materially adverse consequences" are cognizable under the ADA the Court should only consider Florek's ultimate dismissal from the program. Filing No. 58 at 8. Florek's argues the ADA does not require materially adverse consequences and other actions, specifically the professionalism citations should be considered. Filing No. 66 at 20–21. The Court agrees with Florek, albeit on different grounds than those advanced in her briefing.

It is dubious whether the Eighth Circuit has applied the exact rule articulated by Creighton. In support of its claim that only "materially adverse consequences" can support an ADA disparate treatment claim, Creighton relies on the Nebraska Supreme Court's decision in *Doe v. Bd. of Regents of Univ. of Nebraska*, 846 N.W.2d 126 (Neb. 2014) ("*Doe II*"). However, the Court finds that portions of the Nebraska Supreme Court's rule is not supported by Eighth Circuit caselaw.[11] In the case most favorable to Creighton's

---

[11] The *Doe* court summarized, "[t]he element of adverse action may be something short of termination or dismissal from a program, but there must be materially adverse consequences affecting the terms, conditions, or privileges under the program, such that a reasonable trier of fact could find objectively tangible harm." *Id.* The rule statement adopted by the Nebraska Supreme Court was an amalgamation of tests used by the federal circuits. *See Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) (explaining the circuit requires "objectively tangible harm" and "materially adverse consequences" to support an ADA claim for retaliation); *Chambers v. D.C.*, 35 F.4th 870, 870 (D.C. Cir. 2022) (en banc) (abrogating the "objectively tangible harm" for ADA disparate treatment cases); *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 712 (7th Cir. 2000) ("materially adverse change in employment conditions"); *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) ("materially adverse change in the terms and conditions of employment"). Creighton's preferred formulation, "materially adverse consequences" was derived from the D.C. Circuit's description of the standard for retaliation, not disparate treatment. *See Holcomb*, 433 F.3d at 902. While the Nebraska Supreme Court is permitted to look to the law of different circuits for the best interpretation of federal law, the Court is bound by the Eighth Circuit's approach and will, therefore, rely solely on *Brown v. Cox*, 286 F.3d 1040, 1045 (8th Cir. 2002). *Brown* does not use the "materially adverse consequences", or "objectively tangible harm" formulation adopted by the Nebraska Supreme Court. *Id.*

argument, the Eighth Circuit noted, in the context of a disparate treatment claim under the ADA, "[a]n adverse employment action is one that causes a material change in the terms or conditions of employment." 286 F.3d at 1045; *see e.g., Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 630–31 (8th Cir. 2016) (holding there was no adverse action when plaintiff was transferred to a higher paying and less strenuous role). Therefore, the Court concludes *Brown* imposes a requirement that the change in program conditions must be "material."

However, to the extent the Eighth Circuit imposed a materiality requirement to demonstrate adverse action, such a requirement was abrogated by the Supreme Court's recent decision in *Muldrow*, 601 U.S. 346. There, the Supreme Court addressed whether "an employee challenging a transfer under Title VII must meet a heightened threshold of harm—be it dubbed significant, serious, or something similar." *Id.* at 353. The Court concluded that the text of Title VII did not impose a materiality requirement and that a plaintiff "must show some harm respecting an identifiable term or condition of employment." *Id.* at 354–55. In reaching this holding, the Court specifically rejected the Eighth Circuit's requirement that a transfer cause a "materially significant disadvantage." *Id.* at 353. While *Muldrow* addressed Title VII, the Court concludes its reasoning squarely affects the materiality requirement in *Brown* for four reasons.

First, the relevant text of the ADA parallels the text of Title VII. Muldrow relied on the text of 42 U.S.C. § 2000e-2(a)(1) which makes it unlawful for an employer to "to fail or refuse to hire or to discharge any individual, or *otherwise to discriminate* against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

The Court concluded that the "discriminate against" language "refer[s] to 'differences in treatment that injure' employees." *Muldrow*, 601 U.S. at 354 (*quoting Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 681 (2020). "[T]here is nothing" in the text of Title VII "to otherwise establish an elevated threshold of harm." *Id.* at 354–55. Here, the operative provision of the ADA provides ""[n]o individual *shall be discriminated* against on the basis of disability in the full and equal enjoyment of . . . services, . . . of any place of public accommodation." 42 U.S.C. § 12182(a). Likewise, the Rehabilitation Act provides, "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or *be subjected to discrimination* under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Like Title VII, there is no requirement in the text of serious, material, or "objectively tangible harm." Applying *Muldrow's* holding to parallel text in the ADA suggests that an ADA plaintiff needs to show "a difference in treatment" relating to the full and equal enjoyment of a public services but do not need to show "an elevated threshold of harm." *Muldrow*, 601 U.S. at 354–55. Therefore, the text of the ADA and Rehabilitation Act does not support the materiality requirement imposed by *Brown*.

Second, courts applying the disparate treatment provisions of the ADA frequently borrow concepts and standards from the Title VII context. The two statutes are "identical in many respects" and are analyzed in a "parallel fashion." *Buchanan v. Watkins & Letofsky, LLP*, 30 F.4th 874, 877–78 (9th Cir. 2022); *c.f.*, *Cossette v. Minnesota Power & Light*, 188 F.3d 964, 972 (8th Cir. 1999) ("Retaliation claims under the ADA are analyzed identically to those brought under Title VII."). Indeed, the adverse action requirement is an element of the *McDonnell Douglas* burden shifting framework established in the Title

42

VII context. *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994). Given the parallel development of the two statutes, it would be anomalous to impose a different, heightened standard for adverse action in the ADA context, especially without any textural basis for the result.

Third, the *Brown* court's bases for imposing a materiality requirement were specifically disclaimed by *Muldrow*. Specifically, *Brown* relied on Title VII transfer cases and retaliation cases. Both approaches were abrogated by *Muldrow*. To support its conclusion that an adverse action must "cause[] a material change in the terms or conditions of employment" the *Brown* court cited a Title VII retaliation case, *Duffy v. McPhillips*, 276 F.3d 988 (8th Cir. 2002), and a Title VII job transfer case, *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997). However, *Muldrow* specifically distinguished the retaliation context, which is concerned with deterring retaliatory conduct and a materiality requirement is appropriate, from the disparate treatment context, which is concerned with ensuring a discrimination free workplace and a materiality requirement is inappropriate. *Muldrow*, 601 U.S. at 357–58. Therefore, *Brown's* reliance on retaliation caselaw to define adverse action is no longer permissible after *Muldrow*. The Brown court's reliance on *Ledergerber* fares no better. The Eighth Circuit's opinion that was reversed in Muldrow specifically cited and quoted on *Ledergerber* and the Supreme Court specifically disapproved that language. *Compare Brown*, 286 F.3d at 1045 (citing *Ledergerber* for the proposition "a transfer from one job to another is not an adverse employment action if it involves only minor changes in the employee's working conditions with no reduction in pay or benefits") *with Muldrow v. City of St. Louis Missouri*, 30 F.4th 680, 688 (8th Cir. 2022) *with Muldrow*, 601 U.S. at 353, 355 (quoting then disapproving

of the Eighth Circuit's "minor changes in working conditions" language). Therefore, the *Brown* court's imposition of a materiality requirement on ADA plaintiffs relied on two analytic moves that were specifically rejected by the Supreme Court.

Fourth, the Court's conclusion is consistent with the two Circuit Courts who have addressed ADA disparate treatment claims after *Muldrow*. *Rios v. Centerra Grp. LLC*, 106 F.4th 101 (1st Cir. 2024), 112n.4 (1st Cir. 2024) (applying the *Muldrow* standard to the ADA because of the "virtually identical" language and use of the same standards for showing discrimination); *Versaggi v. KLS Martin, L.P.*, No. 21-20547, 2024 WL 2290653, at *2 (5th Cir. May 21, 2024) (applying the *Muldrow* standard in an ADA case). Therefore, even though the Eighth Circuit has not had the opportunity to address the issue, the consensus among the circuits who have is that *Muldrow* changed the law of adverse action under the ADA.

Overall, the textural parallels between the ADA, borrowing between the two statutes, *Brown's* explicit reliance on now abrogated transfer cases, and the post-*Muldrow* decisions form other circuits all point in the same direction: any materiality requirement imposed by *Brown* was abrogated by *Muldrow*. To meet her prima facie case, Florek must show a "difference in treatment that injured" her equal participation in Creighton's pharmacy program. *Muldrow*, 601 U.S. at 354–55.

Applying the proper standard, Florek can show two forms of adverse action taken by Creighton. First, she was issued professionalism citations. The record indicates professionalism citations placed Florek closer to an academic dismissal, required her to complete a corrective action plan, and generally placed her in a worse position compared to her classmates. Second, she was ultimately dismissed from the pharmacy program,

which both sides agree constitutes an adverse action. Thus, the Court will analyze Florek's disparate treatment with respect to the specific professionalism citations and ultimate dismissal.

### b. Because of disability

Creighton argues Florek failed to produce evidence that Florek was issued professionalism citations and dismissed from the program because of her disability. At step one of the *McDonnell Douglas* analysis, the burden on the Plaintiff is to make a "minimal showing." *Kosmicki*, 545 F.3d at 651. Given this low burden, with one exception, the Court assumes without deciding Florek produced sufficient evidence to meet her prima facie case and will address Creighton's arguments at the pretext stage.

However, Florek fails to make even a minimal showing regarding her first professionalism citation, issued by Creighton in January 2019, because the citation preceded her TBI. Filing No. 55-10 (indicating Florek's TBI occurred in June 2019). Therefore, it is impossible for Creighton to have been motivated by Florek's disability and any claim related to that citation fails at step one.

### 3. Legitimate nondiscriminatory reason

Creighton's concerns about Florek's professionalism and suitability to work as a pharmacist are legitimate nondiscriminatory reasons for Florek's professionalism citations and dismissal from the program. A professional school's judgment about a student's professionalism and suitability for a profession is an academic determination that the federal courts are poorly suited to review. *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 226 (1985). Creighton's position is Florek received professionalism citations and was dismissed from the program because of generally applicable expectations about

45

student professionalism.   The Court briefly describes the legitimate, nondiscriminatory rationale for each professionalism citation.

Creighton's legitimate nondiscriminatory reason for the second professionalism citation is Florek's behavior during incident in which Florek traveled to Omaha for her IPPE-4, missed an appointment for a COVID test, was subject to mandatory quarantine upon her return to Hawaii, and missed her scheduled IPPE-3/ The basis for the professionalism citation was her failure to communicate Creighton's experiential learning faculty and lack of candor with her IPPE-3 preceptor.  Florek failed her IPPE-3.

Creighton's legitimate nondiscriminatory reason for the third professionalism citation because of a pattern of unprofessional communications with faculty.  Based on the June 7 email, along with other communications Dr. Jones perceived as unprofessional, Dr. Jones issued a third professionalism citation, citing Florek's "disrespectful, controlling, and demanding" communications and refusal to meet to discuss the circumstances.  Filing No. 56-26.

Creighton's legitimate non-discriminatory reason for the final professionalism citation, that triggered Florek's dismissal from the program was professionalism concerns related to Florek's APPE.  Skrabal issued a professionalism citation because Florek "did not respond to [Skrabal's] email . . ., did not respond to the meeting request, and did not show up for the scheduled meeting on Aug 31st."  Filing No. 56-44.

Florek refused to meet and was dismissed by the faculty for "earning [her] fourth unprofessional behavior citation[,]" triggering a second probationary event, and dismissal under the School of Pharmacy's Scholastic Standing Policy.  Filing No. 56-46.

Overall, Creighton's argument is that Florek was dismissed because she failed to live up to professionalism expectations that apply to all pharmacy students.

**4. Pretext**

Ultimately, Florek's disparate treatment claim fails on pretext. A university's legitimate nondiscriminatory explanation is pretextual if it is contrary to the evidence and there is evidence that discrimination was the true motives. *Kosmicki*, 545 F.3d at 651–52. Florek has some flexibility in how to show pretext. Florek can point to the temporal proximity between Creighton learning of her disability and her dismissal from the program, a similarly situated nondisabled student who was treated more favorably, deviation from Creighton's stated policies, or close in time comments from key decisionmakers reflecting prejudiced attitudes about disability. *Amir*, 184 F.3d at 1028 (temporal proximity and comparator students); *Mathews v. Trilogy Commc'ns, Inc.*, 143 F.3d 1160, 1164–65 (8th Cir. 1998) (certain biased statements by decisionmakers); *Russell v. TG Missouri Corp.*, 340 F.3d 735, 746 (8th Cir. 2003) (deviation from policy).

Here, Florek does not point to any evidence in the record that would permit a reasonable juror to decide that Florek was issued professionalism citations or dismissed from the program because of her disability. Creighton learned of Florek's TBI in August 2019 and was not dismissed from the program until September 2021, over two years later. *Amir*, 184 F.3d at 1028 (holding a year's length between plaintiffs' disclosure of an OCD diagnosis and ultimately dismissal from medical school cut against finding pretext). Florek does not identify, and the record before the court does not demonstrate a non-disabled student who communicated with faculty in a similar manner and was not cited or dismissed by Creighton. *Id.* at 1028.

47

Florek's primary argument for pretext[12] is comments made by decisionmakers across Florek's time at Creighton. The record does not show any comments by decisionmakers evidencing bias towards people with TBIs. Rather Florek identifies comments from decisionmakers doubting Florek's candor and suggesting her accommodations were improperly granted or abused. *See e.g.* Filing No. 63-40. These statements reflect the faculty's attitude towards Florek's use of academic accommodations, not her underlying disability. Therefore, taken in the light most favorable to Florek, these communications may indicate retaliatory motive but do not show that the faculty was biased against Florek because of her TBI. *See* Amir, 184 F.3d at 1028 (distinguishing between circumstantial evidence of disability discrimination and retaliation). Likewise, faculty anger at the tone of Florek's communications and accusations of discrimination and retaliation may suggest a retaliatory motive but does not complete the link back to her TBI. *Id.*

Florek's other argument for pretext are that the individual citations are tainted with procedural abnormality. First, Florek argues that her second and third professionalism citations were based on the same underlying conduct. Filing No. 66 at 28. Second, Florek argues her fourth and final professionalism citation was based on a mistaken impression that she instructed Harmon to cancel her final APPE. *Id.* at 29. Assuming,

---

[12] Florek mixes her failure to accommodate and disparate treatment arguments in her briefing. One of her arguments is that had Creighton accommodated her disability by extending her deadlines to respond, engaging in less combative conversations, and allowing her to respond to faculty requests for information over email she may have been more successful in contesting the merits of her professionalism citations. Filing No. 66 at 21. Further, and somewhat in tension with the requirements of her disparate treatment claim, she argues "had Creighton done what it was supposed to, faculty would have been informed of Ms. Florek's disability, and thus could have seen the need for accommodation." *Id.* The Court concludes these arguments may support a failure to accommodate claim but are not especially probative of pretext because, as discussed *supra* Section B.6, Florek did not request these accommodations. Therefore, their absence was not part of the information available to the decisionmakers and is not helpful for assessing the decisionmakers' intent at the time of the citations or dismissals.

without deciding, a jury could find these actions were procedurally abnormal,[13] they, at most, cast doubt on Creighton's stated reason for the citations and dismissal. They do not provide the missing link that would allow a jury to conclude that Florek's TBI was the real reason for her citations or dismissal. *See Morris v. VA.*, No. 23-3548, 2024 U.S. App. LEXIS 25549 at *4–5 (8th Cir. Oct. 10, 2024) (procedural abnormality without other evidence that the protected trait motivated the adverse action insufficient to survive summary judgment).

Overall, Creighton is entitled to summary judgment on Florek's disparate treatment claim because there is no evidence in the record that would allow a reasonable jury to conclude that Florek's TBI motivated Creighton's decision to issue professionalism citations or dismiss her from the pharmacy program.

### D. ADA- Retaliation

Creighton is not entitled to summary judgment on Florek's retaliation claim. Florek presented sufficient evidence to allow a reasonable jury to conclude that retaliation was the cause of her dismissal and the reasons given for her dismissal were pretext for retaliation.

#### 1. Legal framework

The ADA prohibits a university from discriminating against a student because the student "opposed any act or practice made unlawful by [the ADA], or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 12203(a). "A retaliation claim under

---

[13] The Court has its doubts on this issue as the applicable policy expressly allows faculty to issue additional citations based on a student's lack of responsiveness or refusal to discuss a citation with the faculty. *See* Filing No. 56-7 at 3.

the ADA requires either direct evidence of retaliation or an inference of retaliation under the *McDonnell Douglas* burden-shifting framework." *Canning v. Creighton Univ.*, 995 F.3d 603, 615 (8th Cir. 2021). To make a prima facie case, Florek must show: "(1) [she] engaged in statutorily protected activity; (2) [Creighton] took an adverse action against [her]; and (3) . . . a causal connection [existed] between the adverse action and the protected activity." *Id.* (quoting *Hustvet v. Allina Health Sys.*, 910 F.3d 399, 412 (8th Cir. 2018)). If Florek makes her prima facie case, the burden of production shifts to Creighton to articulate a legitimate non-retaliatory reason for her dismissal. *Id.* Once Creighton makes a showing of a legitimate non-discriminatory reason, the burden of production, and ultimate burden of persuasion shifts back to Florek to show that Creighton's stated reason was pretext for retaliation. *Id.*

### 2. Prima facie case

Florek makes a prima facie case of retaliation. First, Creighton agrees, for the sake of summary judgment, that Florek engaged in statutorily protected activity. Indeed, throughout the series of events that culminated in Florek's dismissal, Florek explicitly accused Creighton faculty of disability discrimination and retaliation.[14] *See e.g.*, Filing No. 64-14 at 2–3. Creighton recognized as much referring her to the university's Title IX office. *See e.g., id.* at 2. Second, Creighton took an adverse action by dismissing Florek from the program. Third, Florek indicated her intent to file a formal complaint and accused Creighton faculty of disability discrimination and retaliation as late as August 31, 2021, Creighton issued the final professionalism citation was filed on September 11, 2021, and

---

[14] Given Creighton's concession, the Court does not address whether Florek has demonstrated "a good faith reasonable belief that the alleged retaliator was engaging in discriminatory activity." *Amir*, 184 F.3d at 1025. This order does not preclude Creighton from arguing that issue at trial.

Florek was discharged from the program on September 16, 2021. Filing No. 64-14 (complaint); Filing No. 56-43; Filing No. 56-45 (dismissal). This close temporal nexus, combined with the intertwined nature of Florek's complaints regarding discrimination and faculty concerns about her communication style is sufficient to satisfy the final element of the prima facie case.

### 3. Legitimate nondiscriminatory reason.

As discussed, *supra* Section C.3, Creighton has proffered a legitimate non-discriminatory reason for Florek's dismissal. Specifically, Creighton's legitimate non-discriminatory reason for Florek's dismissal is Florek failed to meet the professionalism standards required for pharmacists.

### 4. Pretext

Unlike disparate treatment, Florek produced sufficient evidence to create a triable fact issue on pretext. Based on the timeline of Florek's allegations of disability discrimination, statements indicating a belief among members of the faculty that Florek was malingering and taking advantage of accommodations, evidence that members of the faculty were upset with Florek's discrimination allegations, and the intertwined nature of Florek's allegedly unprofessional communications and complaints about discrimination, a reasonable jury could conclude that Creighton's stated reasons were pretext for discrimination. *Amir*, 184 F.3d at 1026. Viewed in the light most favorable to Florek, "[w]hile [Creighton's] proffered evidence is compelling, it does not yield an inescapable conclusion that [Creighton] did not retaliate against [Florek]." *Id.* at 1025.

Specifically, Florek's dismissal occurred shortly after an intense three-month period, when she made numerous complaints to faculty, the provost, and Creighton's general counsel regarding alleged disability discrimination. Temporal proximity between the protected conduct and the adverse action can, when combined with other evidence, show pretext. *Corkrean v. Drake Univ.*, 55 F.4th 623, 632 (8th Cir. 2022). Florek's communications in connection with the two incidents that led to her dismissal, consistently accused Creighton and members of the faculty of discrimination and retaliation. *See* Filing No. 55-29; Filing No. 55-32; Filing No. 56-27; Filing No. 56-31; Filing No. 55-34; Filing No. 56-38. These allegations continued up until two weeks before Florek's ultimate dismissal. Filing No. 64-14 (complaint); Filing No. 56-43 (citation); Filing No. 56-45 (dismissal). The jury could rely on the close temporal proximity between Florek's complaints and her dismissal to establish pretext.

Further, two of the professionalism citations that contributed to Florek's dismissal identified Florek's communication style as a basis for the citations, relying, in part, on communications where Florek made accusations of discrimination and retaliation. "Correlation between increased advocacy and certain adverse actions" can support a finding of pretext. *Riley v. Outlook Nebraska, Inc.*, No. 8:12CV168, 2014 WL 12576286, at *5 (D. Neb. May 9, 2014). Specifically, Florek's third professionalism citation was based on Florek's "disrespectful, controlling, and demanding" tone in email communications. *See* Filing No. 56-25. The citation itself refers to a "threatening email" that stated, "retaliation and cyberbullying me is not tolerated and its illegal" and indicated Florek was speaking to her attorney about the issue. Filing No. 56-26. Florek's fourth professionalism citation was based on an August 30 incidence, in which Florek refused

to attend a meeting with Jones based on Florek's belief that Jones and Skrabal were engaging in disability discrimination and harassment. *See* Filing No. 63-56 (informing Robinson that Florek would not be attending the August 31, 2021, meeting referenced in the fourth professionalism citation because she perceived the meeting request as retaliatory). Jones was aware of that complaint when she issued the final professionalism citation. Filing No. 63-52. Overall, Florek's unprofessional behavior and allegations of discrimination are tired closely together, making it difficult to untangle Creighton's legitimate non-discriminatory reason from pretext on summary judgment.

The record also shows some communications that indicate that decisionmakers were upset by Florek's accusations. Evidence that decisionmakers were unhappy about a student's complaint about discrimination can demonstrate pretext. *Amir*, 184 F.3d at 1026. Here, there are multiple communications that a jury could use to conclude that members of the faculty were upset by Florek's allegations of discrimination. For example, Skrabal, in discussing her difficulties working with Florek, specifically referenced the fact that Florek had previously threatened faculty members with "legal and ACPE" which a jury could understand to refer to instances where Florek had complained about disability discrimination. Filing No. 64-39 at 1. On August 25, 2021, in preparation for the interaction that led to Florek's final professionalism citation, Jones warned Evan Robinson, the Dean of the College that "[s]ince Kelli and Mr. Harmon will most likely not be happy with this decision, I would expect one or both of them to be in contact with their you, Evan, or a higher University administrator" a comment that the jury could understand as a reference to Florek's prior accusations of discrimination and retaliation. Filing No. 63-52. Later, on August 30, 2021, in a text message, Skrabal called Florek's "harassment

and bullying" allegations "unbelievable" and that Florek had threatened "Rhonda [Jones], me, and Katie [Wadas-Thalken]. Filing No. 64-37. Jenny Tilleman, another member of the faculty agreed, writing "[a] very sad situation. If she tries and manipulates at this level, imagine the illegal practices she potentially could do. She doesn't deserve to be a pharmacist now." Id.

Finally, the record shows evidence that key decisionmakers felt like Florek was malingering her TBI symptoms or otherwise threatening legal action to intimidate the faculty. For example, Nystrom expressed a belief to other members of the faculty that Florek had bullied disability services into granting undocumented accommodations, that accommodations may not be warranted, and based on that experience indicated that Florek was among the most challenging students she had worked with. Filing No. 63-40 at 1.[15] Finally, after the May 2021 incident involving Florek's academic accommodation Wadas-Thalken informed faculty members that "we stuck to our guns on the issue and miraculously she got her exam done on time . . .." Filing No. 64-39 at 3. Jones echoed this perception on August 31, 2021, where she informed Creighton's Title IX office that Florek "tried to claim she had an accommodation for a final exam in May," suggesting she did not believe Florek qualified for accommodations and was improperly claiming disability. Filing No. 63-57. A jury could rely on these communications to find that the faculty's opinions of Florek's professionalism were impacted by the faculty's perception that Florek was misusing or not entitled to academic accommodations.

---

[15] In other instances, members of the faculty referred to Florek as a "chronic liar" (Filing No. 63-58 at 3) and a "problem child" (Filing No. 64-38 at 2). Those statements do not appear to reference Florek's use of accommodations, and it is unclear whether the faculty involved were aware of Florek's disability or use of accommodations at the time the statements were made.

Overall, the messy factual record in the three months leading up to Florek's dismissal precludes summary judgment on Creighton's retaliation claim. There is ample support in the record for Creighton's version of events: that Florek was a uniquely difficult student who Creighton tried to support but who ultimately made choices that led to her dismissal. However, there is also evidence in the record supporting Florek's version of events: that Creighton, upset by Florek's allegations of disability discrimination dismissed her based on her advocacy for her rights under the ADA. It is beyond the role of the Court to weigh the evidence and determine what version of events is more likely. Because Florek has raised a triable issue on fact on pretext, it is up to the jury to decide whether Florek's dismissal was legitimate or retaliatory.

### E. State law- breach of contract

Creighton is entitled to summary judgment on Florek's state law breach of contract claim because the anti-retaliation and anti-discrimination provisions are insufficiently definite to form terms of the parties' implied contract and Florek's claims that Creighton breached the disciplinary procedure and grade appeal policies are foreclosed by the plain language of the contract.

#### 1. Legal framework

Under Nebraska law, Florek must show: "existence of a promise, its breach, damage, and compliance with any conditions precedent that activate the defendant's duty." *Phipps v. Skyview Farms, Inc.*, 610 N.W.2d 723, 730 (Neb. 2000).

Nebraska courts recognize that a contract "may be express, implied, written, or oral." *Armstrong v. Clarkson Coll.*, 901 N.W.2d 1, 17 (Neb. 2017). "The relationship between a university and its students is contractual in nature." *Corso v. Creighton Univ.*,

731 F.2d 529, 531 (8th Cir. 1984) (applying Nebraska law); *Armstrong*, 901 N.W.2d at 17 (finding an implied contract created by the student handbook). However, if the student handbook contains a disclaimer, Nebraska courts treat the policies included in the handbook as terms in an implied in fact contract, "where the intention of the parties is not expressed in writing but where the circumstances are such as to show a mutual intent to contract." *Armstrong*, 901 N.W.2d at 17.

When a breach of contract claim implicates a University's academic decision-making, Nebraska courts are deferential to the Universities expert decision-making. *Doe v. Bd. of Regents of Univ. of Nebraska*, 809 N.W.2d 263, 271 (Neb. 2012) ("*Doe III*"). In *Doe III*, The Nebraska Supreme Court applied academic deference to the dismissal of a medical student on professionalism grounds. *Id.* at 271. This approach conforms with the approach of other jurisdictions. *See e.g. Abdullah v. State*, 771 N.W.2d 246, 255 (N.D. 2009); James Rapp, 3 Educ. L. § 8.06(4)(a) (collecting authority). Deference extends to contract claims against private universities. *Armstrong*, 901 N.W.2d at 18.

In the substantive due process context, the Nebraska Supreme Court indicated that a court should only upset a university's academic dismissal upon a showing "of some evidence of arbitrary behavior or bad faith." *Doe v. Bd. of Regents of Univ. of Nebraska*, 788 N.W.2d 264, 293 (Neb. 2010) ("*Doe I*"). The two subsequent Nebraska Supreme Court cases directly addressing a contract claim against a University did not explicitly require evidence of bad faith or arbitrary behavior. *See Doe III*, 809 N.W.2d at 271 (applying academic deference to a student's breach of contract claim but not articulating a standard for breach when academic deference applies); *Armstrong*, 901 N.W.2d at 17 (affirming judgment for a student on a breach of contract claim against a university based

56

on the university and declining to apply academic deference because the breach of contract claim involved a non-academic decision).   However, *Doe III* cited *Doe I*'s discussion of academic deference that adopted the arbitrary or in bad faith standard. *Doe III*, 809 N.W.2d at 271.   Moreover, the *Doe III* court held that any breach from the procedural abnormality was cured by correcting the procedural error before the university appeals council, suggests that procedural deviation alone is not actionable. *Id.* at 317. Given that the arbitrary and bad faith requirement was based on the court's concern about second guessing academic decision-making it would make sense apply it to prevent courts from engaging in searching review of academic decisions through the medium of contract law. *Doe I*, 788 N.W.2d at 531.   On balance, based on the *Doe III* court's citation to the academic standard from *Doe I*, *Doe III*'s holding that the procedural deviation was properly cured later in proceedings, and the parallel concerns about the institutional capacity of the courts to properly review academic decisions, the Court predicts the Nebraska Supreme Court would likely require showing evidence of arbitrary behavior or bad faith to recover on a breach of contract claim based on a University's failure to follow the correct procedure.

*Doe III* demonstrate how procedural error can be used to demonstrate arbitrary behavior.   There, a medical student was expelled based on concerns about his about the medical student's professionalism. *Doe III*, 809 N.W.2d at 269–70.   After prior professionalism incidents, the medical school included a professionalism clause in a contract with the student that provided for dismissal if the student received both a negative evaluation and a negative professionalism checklist. *Id.* at 270.   The court concluded that summary judgment was inappropriate when there was a dispute of material fact whether

the negative professionalism checklist was presented to the faculty. *Id.* at 273. The Court can see how a university telling a student that they would rely on two criteria before expulsion and then expel the student based on only one of those criteria would render the decision arbitrary. Therefore, the Court predicts that the Nebraska Supreme Court would recognize a University's failure to comply with the procedures contained in student handbook are cognizable in a breach of contract claim as evidence of arbitrary behavior. *See Corso*, 731 F.2d at 530. Here, Florek's general theory that Creighton was required to provide one form of procedure but consciously provided another, sufficiently mirrors the facts of *Doe III*, to show evidence of arbitrary conduct. Likewise, though it is a closer call, Florek's argument that Creighton faculty refused to participate in grade appeal policy, leading her to default her appeal rights, appears cognizable under *Doe III.* Therefore, the Court turns to Florek's substantive contract claims.

### 2. Existence of a contract

The evidence supports the existence of an implied contract based on the policy provisions contained in Creighton's Student Handbook and the College of Pharmacy's Scholastic Standing Policy. Under Nebraska law, when a student handbook disclaims the creation of a contract, it is analyzed as an implied contract. *Armstrong*, 901 N.W.2d at 17. Here, the operative student handbook provides "none of the university's policies, procedures or practices, including those set forth in this handbook, are to be viewed as a contract or as making any promises or as creating any contractual rights of any kind." *See e.g.*, Filing No. 56-2 at 8. Likewise, the operative scholastic standing policy provides "[t]his policy is neither a contract nor an offer to enter into a contract." Filing No. 56-6 at 6. These disclaimers prevent the formation of an express contract. *Armstrong*, 901

N.W.2d at 17. However, under *Armstrong*, certain provisions are incorporated into a contract implied in fact between Florek and Creighton. *Id.* Recognizing the state law on the issue, Creighton concedes the existence of an implied contract. While the terms of an implied contract are generally a fact question for the jury (*see Armstrong*, 901 N.W.2d at 17), Nebraska courts have consistently held that sufficiently detailed grievance procedures in employee are incorporated into the parties' implied contracts. *Doe I*, 788 N.W.2d at 294; *Johnston v. Panhandle Co-op. Ass'n*, 408 N.W.2d 261, 267 (Neb. 1987) (addressing implied contracts in the employee handbook setting). Therefore, the Court concludes the facts and circumstances give rise to an implied contract and assumes, without deciding, the disciplinary procedures, academic procedures, and grade appeal policies are terms in the implied contract.

### a. Anti-retaliation and anti-discrimination provision

The anti-retaliation and discrimination provisions are another story. Florek argues that Creighton violated the anti-discrimination and retaliation provisions. Filing No. 66 at 35. Creighton argues that the provisions are insufficiently concrete to form the basis for an implied contract as a matter of law. Filing No. 58 at 21. Joining other courts around the country who have confronted this issue, the Court agrees with Creighton.

Under Nebraska law, a student must "point to an identifiable contractual promise that the [university] did not honor." *Doe I*, 788 N.W.2d at 295 (affirming dismissal on the pleadings on this basis). The Nebraska Supreme Court applied a similar principle in the employment handbook context, holding a contract term referencing "permanent employment" was insufficiently "definite in form" to become a binding contract term. *Johnson*, 408 N.W.2d at 266. The Johnson court contrasted "general statement[s] of

policy" from "definite and specific handbook language on disciplinary procedures." *Id.* at 267–68 (citing *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 626 (Minn. 1983) and *Hunt v. IBM Mid Am. Emps. Fed. Credit Union*, 384 N.W.2d 853, 857 (Minn. 1986)). The *Doe I* court may have adopt a similar distinction to preclude a contract claim for disability discrimination. Specifically, the plaintiff in *Doe I* sued his university for breach of contract under the board's bylaws under two theories: (1) the University failed to comply with the procedure, and (2) the University discriminated against plaintiff based on his disability. *Doe I*, 788 N.W.2d at 294. The court rejected the first theory as duplicative of a rejected procedural due process claim and the second as barred by plaintiff's "fail[ure] to point to an identifiable contractual promise that the defendants did not honor." *Id.* at 295. It is unclear from the *Doe I* opinion and briefing whether the plaintiff relied on an anti-discrimination provision in the board's bylaws or argued disability discrimination as a free-floating theory of breach of contract. *Id.*

To the extent, Nebraska law on this subject is unclear, authority from other jurisdictions indicates that anti-discrimination and anti-retaliation provisions in student handbooks are not sufficiently definite to be incorporated into the implied contract between the student and the University. *Scruggs v. Grand Canyon Univ.*, No. CV-22-00534-PHX-MTL, 2023 WL 8076065, at *6 (D. Ariz. Nov. 21, 2023) (collecting cases). The Courts who have addressed the issue have reasoned that compliance with federal antidiscrimination statutes is a background requirement for employers and colleges and not a specific bargained for promise. *See e.g. Jones v. George Fox Univ.*, No. 3:19-CV-0005-JR, 2021 WL 1414280, at *7 (D. Or. Feb. 3, 2021) *report and recommendation adopted at Jones v. George Fox Univ.*, No. 3:19-CV-00005-JR, 2021 WL 1414202 (D. Or.

Apr. 14, 2021) (claim based on student handbook); *Ferrera v. Bd. of Gadsden Indep. Sch. Dist.*, No. CIV-11-0053 MV/LAM, 2013 WL 12200525, at *3 (D.N.M. Aug. 8, 2013) (claim based on employee handbook). Therefore, a University "is [not] free to discriminate or retaliate against plaintiff as it is still bound by laws prohibiting such conduct" but a plaintiff's remedy is "under state and federal laws prohibiting discrimination" not "a breach of contract claim." *Jones*, 2021 WL 1414280 at *7. Based on its prior opinions in this area, the Court predicts the Nebraska Supreme Court would adopt a similar rule and hold the anti-discrimination and anti-retaliation provisions of the handbook were general statements of law rather than specific contractual promises. Therefore, the provisions cannot form the basis for a breach of contract claim and Florek's remedy lies in the substantive federal anti-discrimination laws.

### 3. Breach

Florek does not contend that her expulsion was generally arbitrary or the result of bad faith. Instead, she contends that Creighton breached the implied contract by failing to: (1) provide procedural protections required by the Behavioral Misconduct during her dismissal process, and (2) follow the grade appeal policy.

#### a. Failure to follow disciplinary grievance procedures.

Florek contends Creighton breached the implied contract by failing to provide certain procedural protections guaranteed by the Behavioral Misconduct Policy contained in the Student Handbook. Specifically, Florek argues that the incidents underlying her dismissal were behavioral in nature and she was entitled to "written notice, an investigative report, a hearing, the opportunity to call witnesses, and certain appeals." Filing No. 66 at 34 quoting Filing No. 64-24 at 114–16. Creighton responds that Florek's

professionalism and citations were classified as an academic issue and Florek received the process required by the handbook. Filing No. 58 at 20.

On this issue, the Court's analysis is purely a matter of contract interpretation. Florek does not argue that the disciplinary procedures were required by due process. *See e.g., Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 84–91 (1978) (discussing the respective due process requirements for disciplinary and academic dismissals from a public institution). Nor does Florek argue that, under Creighton's policy, some academic dismissals trigger additional procedural protections that she was barred from utilizing. *See e.g. Corso*, 731 F.2d at 532–33 (concluding that the university properly categorized a candor issue as academic but holding it breached the contract by failing to provide an appeal required when an academic issue may lead to expulsion). On the other side, Creighton does not argue that it complied with the Behavioral Misconduct Policy. Therefore, the Court's narrow job is to determine based on terms of the implied contract agreed to by the parties, whether Florek's dismissal should have proceeded under the disciplinary or academic procedural track. *See Facilities Cost Mgmt. Grp., LLC v. Oteo Cnty. Sch. Dist. 66-0111*, 868 N.W.2d 67, 74 (Neb. 2015). In engaging in that analysis, the Court is cognizant of two aspects of implied contracts in the higher education context that appear to be in tension with one another. On one hand, student handbooks are contracts of adhesion, where the student has little to no bargaining power, meaning Nebraska courts interpret ambiguities in favor of the non-drafting party. *See Corso*, 731 F.2d at 533. On the other hand, under Nebraska law, academic deference does not only apply to the substantive decisions made by universities but "the procedural requirements surrounding those decisions." *Doe II*, 846 N.W.2d at 152.

Here, the plain language of provisions in the handbook and associated policies support Creighton's reading of the implied contract and do not support Florek's.

Each of Florek's professionalism citations proceeded under the Pharmacy Scholastic Standing Policy not the Disciplinary Policy. Under the Scholastic Standing Policy, the faculty had different options for addressing Florek's allegedly unprofessional behavior, depending on the severity of the conduct ranging from a memorandum of concern to full academic or non-academic misconduct proceedings. Filing No. 56-7 at 1. The sub-misconduct options include issuing a professionalism citation. *Id.* While a student receives less formal process for a professionalism citation, the available sanctions are also less severe. *Id.* (providing for a conversation with faculty but no additional consequences for a single citation). Moreover, once a student earns enough professionalism citations to trigger dismissal, the Scholastic Standing Policy provides for a hearing before the Pharmacy Reinstatement Appeals Committee and an appeal to the provost. Filing No. 56-6 at 4–6. Therefore, the terms of the implied contract expressly allow members of the faculty to exercise their judgment as to whether a given act of unprofessional behavior warrants misconduct charges or merely a professionalism citation. Filing No. 56-7 at 1.

Here, the faculty chose to treat Florek's conduct as a less severe issue warranting a professionalism citation. Throughout, the faculty issued professionalism citations rather pursuing a charge of academic or non-academic misconduct, indicating they saw Florek's behavior as "fall[ing] short of academic or non-academic misconduct" and warranting a lower severity of sanctions. Filing No. 56-6 at 1. The faculty did not cite any Universal Community Standards in the communications leading to Florek's professionalism

citations, the professionalism citations, or the dismissal letter.  *See* Background Section E.  Moreover, the faculty consistently framed their concerns in terms of Florek's professional development and cited to the SPAHP Honor Code and Professional Behavior Policy.  *See e.g.*, Filing No. 56-26 ("The purpose of the citation is for you to reflect on your communication and behavior and learn from it . . . ."); Filing No. 56-25 ("As outlined in the SPAHP Honor Code and Professional Behavior Policy, Creighton pharmacy students are expected to communicate and behave in a manner that reflects positively on the School and the pharmacy profession."); Filing No. 56-39 (similar).  Finally, Florek was dismissed for receiving two probationary events and failing a class, not for a single act of misconduct identified in the underlying professionalism citations.  Filing No. 63-49.  Therefore, Florek's professionalism citations and dismissal fall within the scope of the academic dismissal policy and Florek received the proper process.

In response, Florek argues that some of her actions (such as furnishing false information to her IPPE-3 preceptor) could fall within the scope of Creighton's behavioral misconduct policy.  Filing No. 66 at 34.  However, nothing in the contract requires Creighton to categorize Florek's behavior in that manner.  The Court is required to give deference to Creighton's choice to utilize the professionalism citation process because universities have latitude to categorize issues as disciplinary or academic.  *See Corso*, 731 F.2d at 532.  For example, in *Corso* the plaintiff was dismissed after lying to university officials during an investigation into a medical school cheating ring.  *Id.* at 530.  The district court held the university breached an implied contract because lying was a behavioral matter and plaintiff should have received the process provided by the university's behavioral misconduct policy.  *Id.*  The Eighth Circuit reversed, holding "[b]ecause the

operative facts were premised on an academic matter, it was reasonable to classify the matter as an academic offense." *Id.* at 532. Here, like in *Corso*, Florek's candor issue was wrapped up in issues of professionalism, an issue that is uniquely within the competence of a professional school, and the faculty in their judgment determined it was not severe enough to warrant disciplinary sanctions. *Board of Curators of University of Missouri*, 435 U.S. at 90 ("Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decision making."). Overall, the contract gives faulty discretion to treat an issue as academic or disciplinary in nature and Florek has provided no basis for the Court to question Creighton's academic judgment about the nature of her conduct or to upset its carefully designed set of policies for academic dismissals related to professionalism.[16] Creighton provided Florek the process required by the applicable provisions of the implied contract, Florek has not shown Creighton's categorization was arbitrary or undertaken in bad faith, and is entitled to summary judgment on this aspect of Florek's contract claim.

### b. Failure to follow the grade appeal policy.

---

[16] *Corso*'s second holding does not control this case because the facts are materially different from *Corso*. There, despite agreeing with Creighton that the dismissal was an academic issue, the court ultimately determined there was a breach because the handbook provided for a hearing before a hearing board if an academic issue may lead to dismissal. 731 F.2d at 533. Here, while Florek was permitted to appeal her academic dismissal to the Pharmacy Reinstatement Appeals Board and the university provost Filing No. 64-1 at 101 ("If the school or college of enrollment imposes a serious penalty (i.e., dismissal from a college or school), the student shall have the right to appeal to the University Provost, subject to the provisions outlined below."); Filing No. 56-6 at 6 (providing for an appeal to provost after an academic dismissal by the School of Pharmacy). However, unlike the plaintiff in *Corso* who requested and was denied further process, Florek was advised of her right to appeal her dismissal but took no effort to exercise her rights under the policy. Filing No. 56-47.

Florek contends Creighton breached its grade appeal policy. Creighton promulgated a multistep process for reviewing grade appeals from pharmacy students. Filing No. 64-18. Florek admits that she did not complete all the steps required to appeal her failing grades. However, she contends "Dr. Jones and Dr. Skrabal . . . refused to follow the grade policy," preventing her from seeking review. Filing No. 66 at 35. However, that contention is not supported by the record. Florek claims Jones wrote "in no uncertain terms that the grade was final, and would stand, and clearly indicated there would be no further discussion" but that characterization is inconsistent with the email itself. Filing No. 66 at 35. While the email indicates that the "unsatisfactory grade for . . . PHA433 will move forward," Jones ends the email by directing Florek to the policy on grade appeals "if you would like to appeal the citation or final grade." Filing No. 64-7. Likewise, Florek's characterization that "Dean Wadas-Thalken refused to entertain the appeal" is not consistent with the record. On June 21, 2021, in response to Florek's email looking to formally appeal her PHA433 grade, Wadas-Thalken stated that Florek must complete Step 1 and 2 of the grade policy before submitting a formal appeal. Filing No. 63-46. However, rather than foreclosing any further appeal Dr. Wadas-Thalken informed Florek of the appeals procedure, encouraged Florek to meet with Skrabal, copied Skrabal to set up an appointment, and extended the deadline to give Florek more time to compete the informal process. Id. Indeed, Skrabal responds to the email offering to set up time that week to kickstart step one of the appeal process. Id. Indeed, in the section of Skrabal's deposition cited in Florek's briefing, Skrabal testified that she informed Florek that "if you want to appeal officially, I'm the first step," that she was willing to "touch base by a phone or Zoom" that day to start the official appeals process, but that Florek never

reached out to her. *Id.* at 83:16–84:5. Overall, there is no evidence that would allow a jury to conclude that Creighton violated the grade appeals process by refusing to engage with Florek in the appeals process.

In sum, Creighton is entitled to summary judgment on Florek's contract claim. The anti-discrimination and anti-retaliation policies are general statements of policy, not specific promises that can support a contract claim. Florek has not presented evidence that would allow a reasonable jury to conclude Creighton's decision to treat her conduct as academic in nature was arbitrary or in bad faith or that Creighton's faculty failed to engage with Florek in the grade appeal policy.

### F. State law- Tortious interference with contract

Florek contends Creighton and the Individual Defendants tortiously interfered with her junior partnership agreement with Greg Harmon by dismissing her from the pharmacy program. Creighton moves for summary judgment on two grounds: (1) Creighton and the Individual Defendants lacked the requisite knowledge of Florek's agreement with Harmon, and (2) Creighton's interference with Contract was justified as a matter of law. Disputed issues of material fact preclude summary judgment on these bases. *See* Filing No. 58 at 23–24. Although summary judgment is inappropriate based on the arguments presented by Creighton, the Court notes that Florek's claim appears tenuous under Nebraska law and would be amendable to revisiting the issue in the context of a Rule 50 motion at trial.

#### 1. Legal framework

To recover on a tortious interference of contract claim under Nebraska law, Florek must show: "(1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional

act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted." *Macke v. Pierce*, 661 N.W.2d 313, 317 (Neb. 2003).

Not every act of interference with a contract is actionable, only unjustified interference. *Id.* To determine whether interference is justified Nebraska Courts consider "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." *Id.* at 317–28. The Nebraska Supreme Court has cautioned "whether [interference] was improper under the circumstances—that is under the particular facts of the individual case, not in terms of rules of law or generalizations." *Huff v. Swartz*, 606 N.W.2d 461, 468 (Neb. 2000).

### 2. Knowledge of valid business expectancy

There is a disputed issue of material fact regarding Creighton's knowledge of Florek's business expectancy. There can be no intentional interference if Creighton was unaware of the business expectancy. *Denali Real Est., LLC v. Denali Custom Builders, Inc.*, 926 N.W.2d 610, 626 (Neb. 2019) (listing knowledge as an element of a tortious interference claim). Here, Florek has produced sufficient evidence that would allow a reasonable jury to find that Creighton and the individual Defendants were aware of her business relationship with Harmon. Specifically, members of the faculty, including the individual defendants were copied on an email where Jones relayed Florek's plan to buy Harmon's pharmacy after graduation. *See* Filing No. 64-41. Jones also indicated in a

July 2022 email that "[b]ased on the informational form she submitted last summer for APPEs, she plans to take over as the PIC at this independent pharmacy when she graduates" and identified Harmon as her preceptor and mentor. *See* Filing No. 64-42. At her deposition, Florek testified that she told Skrabal she "was going to take over a pharmacy." Filing No. 55-1 at 277:3–7, 277:22–23, 279:3–12. Therefore, there is sufficient evidence to allow a jury to conclude that Creighton and the individual defendants had knowledge of the business relationship between Florek and Harmon.

Creighton argues that Florek's testimony that she did not inform Creighton of her junior partnership contract with Harmon is fatal to her tortious interference claim. Filing No. 58 at 23; Filing No. 55-1 at 274:3–6, 276:15–23. The Court disagrees for two reasons. First, in *Hoschler v. Kozlik*, the Nebraska Court of Appeals noted the knowledge element was satisfied by allegations that the defendant "had knowledge of [plaintiff's] employment relationship." *Hoschler v. Kozlik*, 529 N.W.2d 822, 825 (Neb. Ct. App. 1995). This decision indicates that the knowledge element focuses on the prospective business relationship not the physical document evidencing the relationship. Second, *Infogroup, Inc. v. Database LLC*'s observation that a business expectancy must be reasonably likely does not help Creighton because there the court was discussing the requirements for a validity not knowledge. *Infogroup, Inc. v. Database LLC*, 95 F. Supp. 3d 1170, 1197 (D. Neb. 2015). The case does not establish that a defendant must be on specific notice of the facts making the business expectancy reasonably likely. Here, given the terms of the junior partnership agreement, a jury could find a valid business expectancy and that Creighton was aware of the business relationship between Florek and Harmon, even if

Florek did not discuss the terms of the junior partnership agreement with Creighton or the individual defendants.

### 3. Justification

Creighton is not entitled to summary judgment based on justification because Nebraska treats justification as a fact-dependent inquiry that is poorly suited to resolution on summary judgment.

While Nebraska courts have not addressed this exact issue, the Court predicts the Nebraska Supreme Court would not recognize a university's dismissal of a student as justified as a matter of law. "[W]hether [interference] was improper under the circumstances—that is under the particular facts of the individual case, not in terms of rules of law or generalizations." *Huff*, 606 N.W.2d at 468. The Nebraska Supreme Court has recognized narrow situations where interference is justified as a matter of law. *Recio v. Evers*, 771 N.W.2d 121, 132 (Neb. 2009) (disclosure of truthful information to a third party); *Lamar Co., LLC v. City of Fremont*, 771 N.W.2d 894, 906 (Neb. 2009) (valid competition between businesses); *Wiekhorst Bros. Excavating & Equip. Co. v. Ludewig*, 529 N.W.2d 33, 41 (Neb. 1995) (design professional's privilege to give advice that may result in the dismissal of the subcontractor). In each instance, the privilege in question was well established by other jurisdictions or recognized by the Restatements of Torts. *See Recio*, 771 N.W.2d at 132 (citing Restatement (Second) of Torts § 767); *Lamar Co., LLC*, 771 N.W.2d at 906 (citing Restatement of Torts § 768); *In re Int. of Daniel W.*, 529 N.W.2d 548, 557 (Neb. Ct. App. 1995) (citing an established body of authority from other jurisdictions). Here, a university's dismissal privilege is not recognized by the Restatement and the Court's research has not identified any jurisdiction that recognizes

a similar privilege. Given the Nebraska Supreme Court's approach in prior cases, the Court predicts it would be unlikely to recognize a wholly novel category of privileged interference and would instead apply the background fact-bound analysis. *Huff*, 606 N.W.2d at 468.

Creighton argues that the Nebraska Supreme Court adopted such a rule in *Doe I*. Filing No. 58 at 24 (citing *Doe I*, 788 N.W.2d at 293–94). Creighton overreads the decision. In the cited portion, the Nebraska Supreme Court addresses what process was due to plaintiff under the Fourteenth Amendment and does not address justification in the context of a tortious inference claim. 788 N.W.2d at 293–94. Certainly, the academic deference principles discussed in *Doe I*, should play a role in the justification analysis. *Id.* at 293 ("In the absence of some evidence of arbitrary behavior or bad faith, courts will not substitute their judgment for the necessarily discretionary judgment of a school or university as to a student's educational performance."). However, as demonstrated in *Armstrong*, Nebraska does not reflexively apply deference to all decisions by universities or preclude juries from hearing cases that involve deference to academic decisions. 901 N.W.2d at 17 (affirming a jury verdict against a university while recognizing some of the university's actions may be protected by academic deference). Therefore, the Nebraska Supreme Court's academic deference case law does not establish that a student's dismissal from a university is justified as a matter of law.

Whether a specific interference with contract is justified is a fact intensive issue that requires balancing "a judgment and choice of values in each situation." *Huff*, 606 N.W.2d at 468 (quoting Restatement (Second) of Torts § 767 cmt. B). Such an inquiry is best left to a jury, properly instructed on the factors outlined in *Huff* and academic

deference under *Doe I* and *Armstrong*. Based on the arguments presented, Creighton is not entitled to summary judgment on Florek's tortious interference claim.

### G. Unjust enrichment

Creighton is not entitled to summary judgment on Florek's unjust enrichment claim because the contents of an implied contract are generally a question of fact. Under Nebraska law, a party has no claim to equitable remedies like unjust enrichment when their relationship is governed by a contract. *Washa v. Miller*, 546 N.W.2d 813, 818–19 (Neb. 1996) ("The doctrine of unjust enrichment is recognized only in the absence of an agreement between the parties. The doctrine does not operate to rescue a party from the consequences of a bad bargain."). Here, a provision of the Creighton School of Pharmacy governs tuition refunds and appears to preclude a refund under Florek's circumstances. Filing No. 56-8 at 66. However, the contents of an implied contract are generally a fact question for the jury, and, unlike disciplinary procedures, the Court's research has not shown a Nebraska case addressing refund provisions in employee or student handbooks. *Armstrong*, 901 N.W.2d at 17. Therefore, the jury should decide whether the cited provision governs all student refunds and precludes Florek's unjust enrichment claim.

### CONCLUSION

The Court recognizes this case is factually and legally sprawling and hopes, with the help of this order, the parties will be able to further narrow the evidence and issues for trial. For the reasons stated above, IT IS ORDERED:

1. Creighton's Motion for Summary Judgment (Filing No. 54) is granted in part and denied in part as stated herein.

Dated this 18th day of October, 2024.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge